EVANSVILLE-VANDERBURGH AIRPORT
AUTHORITY DISTRICT ET AL. *v.*
DELTA AIRLINES, INC., ET AL.

No. 70–99. Argued February 23–24, 1972—Decided April 19, 1972*

---

*Together with No. 70–212, *Northeast Airlines, Inc., et al.* v. *New Hampshire Aeronautics Commission et al.*, on appeal from the Supreme Court of New Hampshire, argued February 24, 1972.

708

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, MARSHALL, BLACKMUN, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 722. POWELL, J., took no part in the consideration or decision of the cases.

*Howard P. Trockman* argued the cause for petitioners in No. 70–99. With him on the briefs was *James F. Flynn*. *John K. Mallory, Jr.,* argued the cause for respondents in No. 70–99 and for appellants in No. 70–212. With him on the brief in No. 70–99 were *Fred P. Bamberger, J. Eugene Marans,* and *Jeffrey R. Kinney*. With him on the brief in No. 70–212 were *Joseph A. Millimet* and *Mr. Marans*. *W. Michael Dunn,* Assistant Attorney General of New Hampshire, argued the cause for appellees in No. 70–212. With him on the brief was *Warren B. Rudman,* Attorney General.

*Donald G. Alexander* filed a brief for the National League of Cities as *amicus curiae* urging reversal in No. 70–99.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question is whether a charge by a State or municipality of $1 per commercial airline passenger to help defray the costs of airport construction and maintenance violates the Federal Constitution. Our answer is that, as imposed in these two cases, the charge does not violate the Federal Constitution.

No. 70–99. Evansville-Vanderburgh Airport Authority District was created by the Indiana Legislature to operate Dress Memorial Airport in Evansville, Indiana. Under its authority to enact ordinances adopting rates and charges to be collected from users of the airport facilities and services, the Airport Authority enacted Ordinance No. 33 establishing "a use and service charge of One Dollar ($1.00) for each passenger enplaning any commercial aircraft operated from the Dress Memorial Airport." The commercial airlines are required to collect and remit the charge, less 6% allowed to cover the airlines' administrative costs in doing so. The moneys collected are held by the Airport Authority "in a separate fund for the purpose of defraying the present and future costs incurred by said Airport Authority in the construction, improvement, equipment, and maintenance of said Airport and its facilities for the continued use and future enjoyment by all users thereof."

Respondents challenged the constitutionality of the charge in an action filed in the Superior Court of Vanderburgh County, Indiana. The court held that the charge constituted an unreasonable burden on interstate commerce in violation of Art. I, § 8, of the Federal Constitution and permanently enjoined enforcement of the ordinance. The Indiana Supreme Court affirmed, —— Ind. ——, 265 N. E. 2d 27 (1970). We granted certiorari, 404 U. S. 820 (1971). We reverse.

No. 70–212. Chapter 391 of the 1969 Laws of New Hampshire, amending N. H. Rev. Stat. Ann. §§ 422:3, 422:43, 422:45, requires every interstate and intrastate "common carrier of passengers for hire by aircraft on a regular schedule" that uses any of New Hampshire's five publicly owned and operated airports to "pay a service charge of one dollar with respect to each passenger emplaning [1] upon its aircraft with a gross weight of 12,500 pounds or more, or a service charge of fifty cents with respect to each passenger emplaning upon its aircraft with a gross weight of less than 12,500 pounds." Fifty percent of the moneys collected are allocated to the State's aeronautical fund and 50% "to the municipalities or the airport authorities owning the public landing areas at which the fees . . . were imposed." The airlines are authorized to pass on the charge to the passenger.[2]

---

[1] "Emplane" is a variant of "enplane." Webster's Third New International Dictionary 743 (1961).

[2] Before the enactment of Chapter 391, N. H. Rev. Stat. Ann. § 422:43 levied a $1 service charge for each passenger boarding a scheduled airline at an airport receiving development funds from a certain state bond issue authorized in 1957. Section 422:44 imposed a similar fee for nonscheduled commercial planes. No fee was imposed for any noncommercial aircraft or for commercial aircraft weighing less than 12,500 pounds. All of the fees collected were to be used to pay off the 1957 bond issue, and the charge was to cease once repayment was completed. N. H. Rev. Stat. Ann. § 422:45.

Chapter 391 broadened the applicability of the fee for *scheduled* airlines to all airports that had received state or local public funds since 1959, and as to these airlines eliminated the provisions terminating the fee upon repayment of the 1957 bond issue. The Act also imposed the 50¢ service charge for boarding of small aircraft (under 12,500 pounds) operated by scheduled airlines, but retained the small-plane exemption for nonscheduled airlines.

Chapter 140 of the New Hampshire Laws of 1971, enacted after the State Supreme Court decision involved here, expanded the charge imposed on *nonscheduled* airlines by including all airports receiving state or local funds after 1959. The legislature did not

Appellants brought this action in the Superior Court of Merrimack County, New Hampshire, and challenged the constitutionality of the charge as to scheduled commercial flights on the grounds of repugnancy to the Commerce Clause, the Equal Protection Clause of the Fourteenth Amendment, and the provisions of the Federal Constitution protecting the right to travel. The Superior Court, without decision, transferred the action to the New Hampshire Supreme Court, and that court sustained the constitutionality of the statute. 111 N. H. 5, 273 A. 2d 676 (1971). We noted probable jurisdiction, 404 U. S. 819 (1971).[3] We affirm.

We begin our analysis with consideration of the contention of the commercial airlines in both cases that the charge is constitutionally invalid under the Court's decision in *Crandall* v. *Nevada,* 6 Wall. 35 (1868). There the Court invalidated a Nevada statute that levied a "tax of one dollar upon every person leaving the State by any railroad, stage coach, or other vehicle engaged or employed in the business of transporting passengers for hire." The Court approached the problem as one of whether levy of "any tax of that character," whatever its amount, impermissibly burdened the constitutionally protected right of citizens to travel. In holding that it did, the Court reasoned:

> "[I]f the State can tax a railroad passenger one dollar, it can tax him one thousand dollars. If one State

eliminate the bond-repayment cut-off, as it had for scheduled airlines, nor did it apply the 50¢ fee to light aircraft operated by nonscheduled airlines.

[3] Courts in Montana and New Jersey have invalidated airport fees similar to those involved here. *Northwest Airlines, Inc.* v. *Joint City-County Airport Bd.,* 154 Mont. 352, 463 P. 2d 470 (1970); *Allegheny Airlines, Inc.* v. *Sills,* 110 N. J. Super. 54, 264 A. 2d 268 (1970). In addition, several legislative proposals for similar taxes have been abandoned on the basis of opinions by state or local officials arguing their invalidity.

can do this, so can every other State. And thus one or more States covering the only practicable routes of travel from the east to the west, or from the north to the south, may totally prevent or seriously burden all transportation of passengers from one part of the country to the other." *Id.,* at 46.[4]

The Nevada charge, however, was not limited, as are the Indiana and New Hampshire charges before us, to travelers asked to bear a fair share of the costs of providing public facilities that further travel. The Nevada tax applied to passengers traveling interstate by privately owned transportation, such as railroads. Thus the tax was charged without regard to whether Nevada provided any facilities for the passengers required to pay the tax. Cases decided since *Crandall* have distinguished it on that ground and have sustained taxes "designed to make [interstate] commerce bear a fair share of the cost of the local government whose protection it enjoys." *Freeman* v. *Hewit,* 329 U. S. 249, 253 (1946).[5] For example, in *Hendrick* v. *Maryland,* 235 U. S. 610 (1915), a District of Columbia resident was convicted of driving in Maryland without paying a fee charged to help defray the costs of road construction and repair. He challenged his conviction on the ground that the fee burdened interstate commerce in violation of the rights of citizens to travel into and through the State. The Court rejected that argument, holding that:

"[W]here a State at its own expense furnishes special facilities for the use of those engaged in com-

---

[4] Concurring Justices invalidated the tax as repugnant to the Commerce Clause. 6 Wall., at 49.

[5] The State's jurisdiction to tax is, however, limited by the due process requirement that the "taxing power exerted by the state [bear] fiscal relation to protection, opportunities and benefits given by the state." *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444 (1940).

merce, interstate as well as domestic, it may exact compensation therefor. The amount of the charges and the method of collection are primarily for determination by the State itself; and so long as they are reasonable and are fixed according to some uniform, fair and practical standard they constitute no burden on interstate commerce. *Transportation Co.* v. *Parkersburg,* 107 U. S. 691, 699; *Huse* v. *Glover,* 119 U. S. 543, 548, 549; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 329, 330; *Minnesota Rate Cases,* 230 U. S. 352, 405; and authorities cited. The action of the State must be treated as correct unless the contrary is made to appear. In the instant case there is no evidence concerning the value of the facilities supplied by the State, the cost of maintaining them, or the fairness of the methods adopted for collecting the charges imposed; and we cannot say from a mere inspection of the statute that its provisions are arbitrary or unreasonable." *Id.,* at 624.

The Court expressly distinguished *Crandall,* saying:

"There is no solid foundation for the claim that the statute directly interferes with the rights of citizens of the United States to pass through the State, and is consequently bad according to the doctrine announced in *Crandall* v. *Nevada,* 6 Wall. 35. In that case a direct tax was laid upon the passenger for the privilege of leaving the State; while here the statute at most attempts to regulate the operation of dangerous machines on the highways and to charge for the use of valuable facilities." *Ibid.*[6]

---

[6] This distinction has been drawn in other cases. For example, in striking down a state tax construed as falling "upon the privilege of carrying on a business that was *exclusively* interstate in character," *Spector Motor Service, Inc.* v. *O'Connor,* 340 U. S. 602,

We therefore regard it as settled that a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed on interstate and domestic users alike. The principle that burdens on the right to travel are constitutional only if shown to be necessary to promote a compelling state interest has no application in this context. See *Shapiro* v. *Thompson,* 394 U. S. 618 (1969). The facility provided at public expense aids rather than hinders the right to travel. A permissible charge to help defray the cost of the facility is therefore not a burden in the constitutional sense.

The Indiana and New Hampshire Supreme Courts differed in appraising their respective charges in terms of whether the charge was for the use of facilities in aid of travel provided by the public. The Indiana Supreme Court held that the Evansville charge "is not reasonably related to the use of the facilities which benefit from the tax . . . ." —— Ind., at ——, 265 N. E. 2d, at 31. The New Hampshire Supreme Court, on the other hand, held that the New Hampshire charge was a "fee for the use of facilities furnished by the public" that did not "exceed reasonable compensation for the use provided." 111 N. H., at 9, 273 A. 2d, at 678, 679.

In addressing the question, we do not think it particularly important whether the charge is imposed on the passenger himself, to be collected by the airline, or on the airline, to be passed on to the passenger if it chooses. In either case, it is the act of enplanement and the consequent use of runways and other airport facilities that give rise to the obligation. Our inquiry

---

609 (1951) (emphasis in original), the Court expressly distinguished it from a tax "levied as compensation for the use of highways." *Id.,* at 607.

is whether the use of airport facilities occasioned by enplanement is a permissible incident on which to levy these fees, regardless of whether the airline or its passengers bear the formal responsibility for their payment.

Our decisions concerning highway tolls are instructive. They establish that the States are empowered to develop "uniform, fair and practical" standards for this type of fee. While the Court has invalidated as wholly unrelated to road use a toll based on the carrier's seating capacity, *Interstate Transit, Inc.* v. *Lindsey,* 283 U. S. 183 (1931); *Sprout* v. *South Bend,* 277 U. S. 163 (1928), and the amount of gasoline over 20 gallons in the carrier's gas tank, *McCarroll* v. *Dixie Greyhound Lines, Inc.,* 309 U. S. 176 (1940), we have sustained numerous tolls based on a variety of measures of actual use, including: horsepower, *Hendrick* v. *Maryland, supra; Kane* v. *New Jersey,* 242 U. S. 160 (1916); number and capacity of vehicles, *Clark* v. *Poor,* 274 U. S. 554 (1927); mileage within the State, *Interstate Busses Corp.* v. *Blodgett,* 276 U. S. 245 (1928); gross-ton mileage, *Continental Baking Co.* v. *Woodring,* 286 U. S. 352 (1932); carrying capacity, *Hicklin* v. *Coney,* 290 U. S. 169 (1933); and manufacturer's rated capacity and weight of trailers, *Dixie Ohio Express Co.* v. *State Revenue Comm'n,* 306 U. S. 72 (1939).

We have also held that a State may impose a flat fee for the privilege of using its roads, without regard to the actual use by particular vehicles, so long as the fee is not excessive. *Aero Mayflower Transit Co.* v. *Georgia Public Service Comm'n,* 295 U. S. 285 (1935); *Morf* v. *Bingaman,* 298 U. S. 407 (1936); *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs,* 332 U. S. 495 (1947). And in *Capitol Greyhound Lines* v. *Brice,* 339 U. S. 542 (1950), the Court sustained a Maryland highway toll of "2% upon the fair market value

of motor vehicles used in interstate commerce." That toll was supplemental to a standard mileage charge imposed by the State, so that "the total charge as among carriers [did] vary substantially with the mileage traveled." *Id.*, at 546. It was there argued, however, that the correlation between tax and use was not precise enough to sustain the toll as a valid user charge. Noting that the tax "should be judged by its result, not its formula, and must stand unless proven to be unreasonable in amount for the privilege granted," *id.*, at 545, the Court rejected the argument:

> "Complete fairness would require that a state tax formula vary with every factor affecting appropriate compensation for road use. These factors, like those relevant in considering the constitutionality of other state taxes, are so countless that we must be content with 'rough approximation rather than precision.' *Harvester Co.* v. *Evatt*, 329 U. S. 416, 422–423. Each additional factor adds to administrative burdens of enforcement, which fall alike on taxpayers and government. We have recognized that such burdens may be sufficient to justify states in ignoring even such a key factor as mileage, although the result may be a tax which on its face appears to bear with unequal weight upon different carriers. *Aero Transit Co.* v. *Georgia Comm'n*, 295 U. S. 285, 289. Upon this type of reasoning rests our general rule that taxes like that of Maryland here are valid unless the amount is shown to be in excess of fair compensation for the privilege of using state roads." *Id.*, at 546–547.

Thus, while state or local tolls must reflect a "uniform, fair and practical standard" relating to public expenditures, it is the amount of the tax, not its formula, that is of central concern. At least so long as the toll is based on some fair approximation of use or privilege

for use, as was that before us in *Capitol Greyhound,* and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users.

The Indiana and New Hampshire charges meet those standards. *First,* neither fee discriminates against interstate commerce and travel. While the vast majority of passengers who board flights at the airports involved are traveling interstate, both interstate and intrastate flights are subject to the same charges. Furthermore, there is no showing of any inherent difference between these two classes of flights, such that the application of the same fee to both would amount to discrimination against one or the other. See *Nippert v. Richmond,* 327 U. S. 416 (1946).

*Second,* these charges reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed. We recognize that in imposing a fee on the boarding of commercial flights, both the Indiana and New Hampshire measures exempt in whole or part a majority of the actual number of persons who use facilities of the airports involved. Their number includes certain classes of passengers, such as active members of the military and temporary layovers,[7] deplaning commercial passengers,[8] and passengers on noncommercial flights,[9] nonscheduled commercial flights,[10] and commer-

---

[7] Active members of the military and temporary layovers are not subject to the Indiana tax. The New Hampshire statute on its face does not distinguish these classes of passengers.

[8] Deplaning passengers are not subject to either tax.

[9] Private aviators are not subject to either tax.

[10] New Hampshire imposes a fee of $1 for nonscheduled flights on aircraft weighing more than 12,500 pounds, but no fee for nonscheduled flights on lighter planes; the $1 fee lapses upon repay-

cial flights on light aircraft.[11]  Also exempt are non-passenger users, such as persons delivering or receiving air-freight shipments, meeting or seeing off passengers, dining at airport restaurants, and working for employers located on airport grounds.  Nevertheless, these exceptions are not wholly unreasonable.  Certainly passengers as a class may be distinguished from other airport users, if only because the boarding of flights requires the use of runways and navigational facilities not occasioned by nonflight activities.  Furthermore, business users, like shops, restaurants, and private parking concessions, do contribute to airport upkeep through rent, a cost that is passed on in part at least to their patrons.  And since the visitor who merely sees off or meets a passenger confers a benefit on the passenger himself, his use of the terminal may reasonably be considered to be included in the passenger's fee.

The measures before us also reflect rational distinctions among different classes of passengers and aircraft.  Commercial air traffic requires more elaborate navigation and terminal facilities, as well as longer and more costly runway systems, than do flights by smaller private planes.[12]  Commercial aviation, therefore, may be made

---

ment of a bond issue authorized in 1957.  See n. 2, *supra*.  The Indiana ordinance on its face does not distinguish between scheduled and nonscheduled commercial flights.

[11] New Hampshire imposes a 50¢ fee for commercial flights on light aircraft if scheduled, and no fee if unscheduled.  The Indiana ordinance on its face does not distinguish light from heavy aircraft.

[12] The parties in No. 70–99, for example, have stipulated that "[m]ost of the facilities constituting the Terminal Building at Dress Memorial Airport would not be essential for the operation of a noncommercial airport except for the required use thereof by persons traveling on commercial airlines," that "runway lengths, approach areas, taxiways and ramp areas of said Dress Memorial Airport would not be so extensive except for the requirement that the same be sufficiently extensive in order to accommodate commercial airline

to bear a larger share of the cost of facilities built primarily to meet its special needs, whether that additional charge is levied on a per-flight basis in the form of higher takeoff and landing fees, or as a toll per passenger-use in the form of a boarding fee. In short, distinctions based on aircraft weight or commercial versus private use do not render these charges wholly irrational as a measure of the relative use of the facilities for whose benefit they are levied. Nor does the fact that they are levied on the enplanement of commercial flights, but not deplanement. It is not unreasonable to presume that passengers enplaning at an airport also deplane at the same airport approximately the same number of times. The parties in No. 70–99, for example, have stipulated that the number of passengers enplaning and deplaning at Dress Memorial Airport in 1967 was virtually the same. Thus, a fee levied only on the boarding of commercial aircraft can reasonably be supposed to cover a charge on use by passengers when they deplane.[13]

*Third,* the airlines have not shown these fees to be excessive in relation to costs incurred by the taxing authorities. The record in No. 70–99 shows that in

---

carriers and their passengers," and that "Dress Memorial Airport operates and maintains an instrument lighting system and an approach lighting system for use by commercial airlines, both of which are costly to maintain and operate and would not be necessary in connection with use by private, noncommercial aircraft." App. 54, 55.

[13] Because they do reflect a rational measure of relative use, these exceptions and exemptions are also consistent with the requirement of the Equal Protection Clause, that "in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.' *Baxstrom* v. *Herold,* 383 U. S. 107, 111; *Carrington* v. *Rash,* 380 U. S. 89, 93; *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 37; *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415." *Rinaldi* v. *Yeager,* 384 U. S. 305, 309 (1966).

1965 the Evansville-Vanderburgh Airport Authority paid bond retirement costs of $166,000 for capital improvements at Dress Memorial Airport, but recovered only $9,700 of these costs in the form of airport revenue. The airport's revenues covered only $63,000 of the Authority's $184,000 bond costs in 1966, $87,000 of $182,000 in 1967, and $65,000 of $178,000 in 1968. The respondents in No. 70–99 have advanced no evidence that a $1 boarding fee, if permitted to go into effect, would do more than meet these past, as well as current, deficits. Appellants in No. 70–212 have likewise failed to offer proof of excessiveness.

This omission in No. 70–212 suffices to dispose of the final attack by appellants in that case on the New Hampshire statute. Appellants argue that the statute "on its face belies any legislative intent to impose an exaction based solely on use" because only 50% of its revenue is allocated to the state aeronautical fund while "the remaining fifty per cent is allocated to the municipalities or airport authorities owning the landing areas at which the fees were imposed in the form of unrestricted general revenues." Brief 51–52. Yet so long as the funds received by local authorities under the statute are not shown to exceed their airport costs, it is immaterial whether those funds are expressly earmarked for airport use. The State's choice to reimburse local expenditures through unrestricted rather than restricted revenues is not a matter of concern to these appellants. See *Clark* v. *Poor,* 274 U. S., at 557; *Morf* v. *Bingaman,* 298 U. S., at 412; *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs,* 332 U. S., at 502–505.

We conclude, therefore, that the provisions before us impose valid charges on the use of airport facilities constructed and maintained with public funds. Furthermore, we do not think that they conflict with any federal policies furthering uniform national regulation

of air transportation. No federal statute or specific congressional action or declaration evidences a congressional purpose to deny or pre-empt state and local power to levy charges designed to help defray the costs of airport construction and maintenance. A contrary purpose is evident in the Airport and Airway Development Act of 1970, 84 Stat. 219, 49 U. S. C. § 1701 *et seq.* That Act provides that as "a condition precedent to his approval of an airport development project," the Secretary of Transportation must determine that

> "the airport operator or owner will maintain a fee and rental structure for the facilities and services being provided the airport users which will make the airport as self-sustaining as possible under the circumstances existing at that particular airport, taking into account such factors as the volume of traffic and economy of collection." 49 U. S. C. § 1718 (8).

The commercial airlines argue in these cases that a proliferation of these charges in airports over the country will eventually follow in the wake of a decision sustaining the validity of the Indiana and New Hampshire fees, and that this is itself sufficient reason to adjudge the charges repugnant to the Commerce Clause. "If such levies were imposed by each airport along a traveller's route, the total effect on the cost of air transportation could be prohibitive, the competitive structure of air carriers could be affected, and air transportation, compared to other forms of transportation, could be seriously impaired." Brief for Appellants in No. 70–212, p. 44. The argument relies on *Bibb* v. *Navajo Freight Lines, Inc.,* 359 U. S. 520 (1959). There the Court invalidated an Illinois statute requiring that trucks and trailers using Illinois highways be equipped at the state line with a contour mudguard of specified design.

The lower courts had found that the contour mudguard possessed no advantages in terms of safety over the conventional flap permitted in all other States and indeed created safety hazards. But there is no suggestion that the Indiana and New Hampshire charges do not in fact advance the constitutionally permissible objective of having interstate commerce bear a fair share of the costs to the States of airports constructed and maintained for the purpose of aiding interstate air travel. In that circumstance, "[a]t least until Congress chooses to enact a nation-wide rule, the power will not be denied to the State[s]." *Freeman* v. *Hewit,* 329 U. S., at 253; see also *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 775–776 (1945).

The judgment in No. 70–99 is reversed; the judgment in No. 70–212 is affirmed.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of these cases.

MR. JUSTICE DOUGLAS, dissenting.

These cases are governed by *Crandall* v. *Nevada,* 6 Wall. 35, which must be overruled if we are to sustain the instant taxes.

One case involves an Indiana tax of $1 on every enplaning commercial airline passenger at the Evansville Airport. The other involves a New Hampshire $1 tax on every passenger enplaning a scheduled commercial aircraft with a gross weight of 12,500 pounds or more and a 50¢ tax on every passenger enplaning such aircraft with a gross weight of less than 12,500 pounds.

The carriers are made responsible for paying, accounting for, and remitting the fee to the local authority.

*Crandall* v. *Nevada,* decided before the Fourteenth Amendment, struck down a state law which levied a

$1 tax on every person leaving the State by rail, stage coach, or other common carrier. Mr. Justice Miller, speaking for the Court, said the citizen had rights which the tax abridged:

> "He has a right to free access to its sea-ports, through which all the operations of foreign trade and commerce are conducted, to the sub-treasuries, the land offices, the revenue offices, and the courts of justice in the several States, and this right is in its nature independent of the will of any State over whose soil he must pass in the exercise of it." *Id.*, at 44.

And he quoted with approval from the dissenting opinion in the *Passenger Cases,* 7 How. 283, 492:

> " 'For all the great purposes for which the Federal government was formed we are one people, with one common country. We are all citizens of the United States, and as members of the same community must have the right to pass and repass through every part of it without interruption, as freely as in our own States. And a tax imposed by a State, for entering its territories or harbors, is inconsistent with the rights which belong to citizens of other States as members of the Union, and with the objects which that Union was intended to attain. Such a power in the States could produce nothing but discord and mutual irritation, and they very clearly do not possess it.' " 6 Wall., at 48–49.

Usually the right to travel has been founded on the Commerce Clause.[1] See *United States* v. *Guest,* 383 U. S. 745, 758–759. Some, including myself, have thought the right to travel was a privilege and immunity of national

---

[1] *Helson & Randolph* v. *Kentucky,* 279 U. S. 245, 251; *Philadelphia & Southern S. S. Co.* v. *Pennsylvania,* 122 U. S. 326, 339; *Colgate* v. *Harvey,* 296 U. S. 404, 443–444 (Stone, J., dissenting); *Bowman* v. *Chicago & Northwestern R. Co.,* 125 U. S. 465, 480–481.

citizenship.[2]   *Edwards* v. *California*, 314 U. S. 160, 177 (DOUGLAS, J., concurring). Whatever the source, the right exists.[3]   See *Graham* v. *Richardson*, 403 U. S. 365;

---

[2] *Oregon* v. *Mitchell*, 400 U. S. 112, 285 (STEWART, J., concurring and dissenting); *Bell* v. *Maryland*, 378 U. S. 226, 250, 255 (separate opinion of DOUGLAS, J.), 293–294, n. 10 (Goldberg, J., concurring); *New York* v. *O'Neill*, 359 U. S. 1, 12 (DOUGLAS, J., dissenting); *Kent* v. *Dulles*, 357 U. S. 116, 125–127; *Edwards* v. *California*, 314 U. S. 160, 177 (DOUGLAS, J., concurring), 181 (Jackson, J., concurring); *Gilbert* v. *Minnesota*, 254 U. S. 325, 337 (Brandeis, J., dissenting); *Twining* v. *New Jersey*, 211 U. S. 78, 97; *Cook* v. *Pennsylvania*, 97 U. S. 566; *United States* v. *Wheeler*, 254 U. S. 281; *Colgate* v. *Harvey*, 296 U. S., at 429–430; *Slaughter-House Cases*, 16 Wall. 36, 79.

[3] Only the other day in *Dunn* v. *Blumstein, ante,* p. 330, we held a durational residence requirement that was a prerequisite to voting invalid because it "directly impinges on the exercise of a . . . fundamental personal right, the right to travel." And we cited a host of "right to travel" cases including *United States* v. *Guest,* 383 U. S. 745, 758; *Passenger Cases,* 7 How. 283, 492 (Taney, C. J., dissenting); *Crandall* v. *Nevada,* 6 Wall. 35; *Paul* v. *Virginia,* 8 Wall. 168, 180; *Edwards* v. *California, supra; Kent* v. *Dulles,* 357 U. S., at 126; *Shapiro* v. *Thompson,* 394 U. S. 618, 629–631, 634; *Oregon* v. *Mitchell,* 400 U. S., at 237 (separate opinion of BRENNAN, WHITE, and MARSHALL, JJ.), 285–286 (STEWART, J., concurring and dissenting).

In answer to the argument that actual deterrence of travel need not be shown we said: "It is irrelevant whether disenfranchisement or denial of welfare is the more potent deterrent to travel. *Shapiro* did not rest upon a finding that denial of welfare actually deterred travel. Nor have other 'right to travel' cases in this Court always relied on the presence of actual deterrence. In *Shapiro* we explicitly stated that the compelling state interest test would be triggered by 'any classification which served to *penalize* the exercise of that right [to travel] . . . .'  [394 U. S.], at 634 (emphasis added); see *id.,* at 638 n. 21. While noting the frank legislative purpose to deter migration by the poor, and speculating that 'an indigent who desires to migrate . . . will doubtless hesitate if he knows that he must risk' the loss of benefits, *id.,* at 628–629, the majority found no need to dispute the 'evidence that few welfare recipients have in fact been deterred [from moving] by residence

*Griffin* v. *Breckenridge,* 403 U. S. 88, 105–106; *Oregon* v. *Mitchell,* 400 U. S. 112, 237–238 (separate opinion of BRENNAN, WHITE, and MARSHALL, JJ.); *Shapiro* v. *Thompson,* 394 U. S. 618, 630–631; *United States* v. *Guest,* 383 U. S., at 757–758.

Heretofore, we have held that a tax imposed on a carrier but measured by the number of passengers is no different from a direct exaction upon the passengers themselves, whether or not the carrier is authorized to collect the tax from the passengers. *Pickard* v. *Pullman Southern Car Co.,* 117 U. S. 34, 46; *State Freight Tax Case,* 15 Wall. 232, 281. To be sure, getting onto a plane is an intrastate act. But a tax imposed on a local activity that is related to interstate commerce is valid only if the local activity is not such an integral part of interstate commerce that it cannot be realistically separated from it.[4] *Michigan-Wisconsin Pipe Line Co.* v.

---

requirements.' *Id.,* at 650 (Warren, C. J., dissenting); see also *id.,* at 671–672 (Harlan, J., dissenting). Indeed, none of the litigants had themselves been deterred." *Ante,* at 339–340.

[4] In *Helson & Randolph* v. *Kentucky,* 279 U. S. 245, for example, we considered a tax imposed by the State of Kentucky upon the use, within its borders, of gasoline by interstate carriers. We determined that such a tax was a direct burden on an instrumentality of interstate commerce and therefore struck it down. We said:

"The tax is exacted as the price of the privilege of using an instrumentality of interstate commerce. It reasonably cannot be distinguished from a tax for using a locomotive or a car employed in such commerce. A tax laid upon the use of the ferry boat, would present an exact parallel. And is not the fuel consumed in propelling the boat an instrumentality of commerce no less than the boat itself? A tax, which falls directly upon the use of one of the means by which commerce is carried on, directly burdens that commerce. If a tax cannot be laid by a state upon the interstate transportation of the subjects of commerce, as this Court definitely has held, it is little more than repetition to say that such a tax cannot be laid upon the use of a medium by which such transportation is effected. 'All restraints by exactions in the form of taxes

*Calvert,* 347 U. S. 157, 166. In that case the tax struck down was the tax on gas that had been processed for interstate use—and a tax "on the exit of the gas from the State." *Id.,* at 167. We held that that exit was "a part of interstate commerce itself." *Id.,* at 168.

The same is true here, for the step of the passenger enplaning the aircraft is but an instant away from and an inseparable part of an interstate flight.

Of course interstate commerce can be made to pay its fair share of the cost of the local government whose protection it enjoys. But though a local resident can be made to pay taxes to support his community, he cannot be required to pay a fee for making a speech or exercising any other First Amendment right. Like prohibitions obtain when licensing is exacted for exercising constitutional rights. *Lovell* v. *Griffin,* 303 U. S. 444, 451–452; *Thomas* v. *Collins,* 323 U. S. 516, 540–541; *Harman* v. *Forssenius,* 380 U. S. 528, 542. Heretofore we have treated the right to participate in interstate commerce in precisely the same way on the theory that the "power to tax the exercise of a privilege is the power to control or suppress its enjoyment." *Murdock* v. *Pennsylvania,* 319 U. S. 105, 112. I adhere to that view; federal constitutional rights should neither be "chilled" nor "suffocated."

Are we now to assume that *Calvert* and *Murdock* are no longer the law?

I would affirm the Indiana judgment and reverse New Hampshire's.

---

upon such transportation, or upon acts necessary to its completion, are so many invasions of the exclusive power of Congress to regulate that portion of commerce between the States.'" *Id.,* at 252.