AMERICAN AIRLINES, INC., et al., Plaintiffs, Appellants,

v.

MASSACHUSETTS PORT AUTHORITY et al., Defendants, Appellees.

No. 77–1150.

United States Court of Appeals, First Circuit.

Argued June 2, 1977.

Decided Sept. 1, 1977.

John R. Hally, Boston, Mass., with whom Craig E. Stewart, Charles R. Parrott, Alan Mandl, Nutter, McClennen & Fish, Robert Vance Brown, Boston, Mass., were on brief, for appellants.

Joseph A. Bosco, Boston, Mass., with whom Douglas B. MacDonald, Robert E. Sullivan, Gerald F. Rath, Steven W. Hansen, Richard C. Heidlage, Herrick & Smith, and vom Baur, Coburn, Simmons & Turtle, Boston, Mass., were on brief, for Massachusetts Port Authority, appellee.

Thayer Fremont-Smith, Boston Mass., with whom Kenneth Laurence, Amos Hugh Scott, and Choate, Hall & Stewart, Boston, Mass., were on brief, for New England Merchants National Bank, as Trustee, appellee.

Marvin E. Krakow, Robert L. Weiss, Jr., and Peter L. Koff, Asst. Corp. Counsel, Boston, Mass., on brief for East Boston Residents and the City of Boston, amici curiae.

Before COFFIN, Chief Judge, LAY * and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Plaintiffs, eighteen airlines, sought a declaratory judgment that the action of the Massachusetts Port Authority (Massport), owner of Logan International Airport, in raising airlines' landing fees 52 percent in 1977 was an unconstitutional burden on interstate commerce. They announced that they would pay only at the 1976 rate. Massport counterclaimed for the difference between the 1976 and 1977 amounts. After affidavits were submitted, the district court dismissed the complaint, and granted summary judgment for Massport on its counterclaim.

Massport's action increased the landing fees paid by the airlines from $8.4 million to $12.6 million. Of the increase, $2.5 million is attributed to the cost of three projects totalling some $46 million.[1] All were deemed by the airlines of little or no use to them. The first was the Runway Extension and Construction Project. Runway extensions had been planned and substantially built, as well as a "short takeoff and landing" (STOL) runway. The work was brought to a halt because of state environmental law litigation. The runway extensions were converted into so called "extended runway safety areas" of dubious utility,

---

* Of the Eighth Circuit, sitting by designation.

1. The airlines say that there may be other facilities whose costs are impermissibly included in the 1977 landing fee, but that, lacking discovery, they have not been able to identify them.

according to the airlines. STOL was obliterated. These projects had by this time run up a cost of from $4 million to $31 million. A second item accounting for the increased landing fee was the filling of a tidal area, the Bird Island flats, a 280 acre plot of which 105 acres were vacant and held for future development.[2] The cost of the flats runs between $28 million and $41 million, the vacant part of which is alleged not to be of any present use to the airlines. Finally, Massport has included in its landing fee charge the cost of its commitment to pay the East Boston Neighborhood Health Center $100,000 a year for ten years for assistance in any airport disaster requiring emergency medical aid.

The parties are agreed that the validity of the tax, or landing fee, in terms of the reasonableness of the burden on interstate commerce, is governed by *Evansville-Vanderburgh Airport Authority District v. Delta Airlines*, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972). The airlines do not contest that Massport's landing fee passes the first two tests of not discriminating against interstate commerce, as distinguished from intrastate commerce, and of being calculated by a fair formula, the landing weight of aircraft. But they base their case on *Evansville's* language that a tax may not be "excessive in comparison with the governmental benefit conferred." 405 U.S. at 716–717, 92 S.Ct. at 1355. Standing on this language, they urge that they are entitled to have discovery and to make the effort to prove that the present landing fee, particularly the dramatic 1977 increase, is not productive of any commensurate benefit to them.

The district court seized on *Evansville's* formulation that a charge must not be "ex-cessive in relation to costs incurred by the taxing authorities". *Id.* at 719, 92 S.Ct. at 1357. Massport relies on this language, as well as the cases cited in *Evansville*, and the alleged impracticability of applying the airlines' formula of relation of tax to value received.

We side with Massport. We recognize that *Evansville* has isolated language that supports the airlines, but the overwhelming thrust is toward a comparison of the tax with costs incurred in connection with construction of facilities. *Id.* at 712, 713, 714, 719, 720, 721, and 722, 92 S.Ct. 1349. This is consistent with the approach taken in other cases which focus on whether the revenue raised by the fee roughly approximates the cost of providing the facilities and services. *See, e. g., Capitol Greyhound Lines v. Brice*, 339 U.S. 542, 70 S.Ct. 806, 94 L.Ed. 1053 (1950); *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939); *Ingels v. Morf*, 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653 (1937); *Morf v. Bingaman*, 298 U.S. 407, 56 S.Ct. 756, 80 L.Ed. 1245 (1936); *Interstate Transit, Inc. v. Lindsey*, 283 U.S. 183, 51 S.Ct. 380, 75 L.Ed. 953 (1931); *Hendrick v. Maryland*, 235 U.S. 610, 35 S.Ct. 140, 59 L.Ed. 385 (1915).[3]

Indeed, we cannot see how a federal system, recognizing state sovereignty, could work on a basis of customer judgments of benefits received. A state could supply facilities which would be of critical importance to some users, of moderate convenience to others, and of marginal use to the remainder. If such taxes as landing fees were to be subject to attack from each user, depending upon the particular utility, their imposition could be a matter of endless and shifting controversy. Such an approach

---

**2.** 84 acres were made available, at the airlines' request, for construction of cargo storage and other support facilities. Fill was completed in this area but because of a decrease in the air cargo business, the airlines withdrew their requests for this space. The remainder of the flats is used for a taxiway, safety overruns, and a clear zone.

**3.** The airlines try to draw support for the proposition that courts should inquire into the details of a state's justification of a tax on carri-

ers from *Ingels v. Morf*, 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653 (1937) and *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939). But in those cases the question whether the revenues from fees grossly exceeded the cost of providing the service posited as the justification necessitated establishing the cost from a description of the services provided. Here, the cost of the facilities and the health center contract are established.

would subject every taxing authority to the judgments of courts as to the wisdom, the foresight, and the efficiency of its plans from the viewpoint of each affected customer.

Not only would the airports be subject to uncertainty, in effect having to aim their tax plans at a moving target, but the courts would find themselves involved in long trials attempting to adjudicate the quantum of benefit received by an airline, the normative ratio between benefit and tax, and the amount of reasonable cost which could be properly allocated to the users. We do not think that states are held to such a punctilio of proof. In *Clark v. Paul Gray, Inc., supra,* 306 U.S. at 599, 59 S.Ct. at 753, the Court said that "The state is not required to compute with mathematical precision the cost to it of the services necessitated by the . . . traffic."

This is not to say that states can run wild and tax users for all extravagances. The facilities must be relevant to the operation of the airport. And the revenue from the landing fee must be fairly consonant with the costs incurred. But within these broad parameters users share both the benefits and the costs of an airport's decisions, including the imprudent ones.

In this case it is not disputed that the expenditures were actually incurred or that the fee is accurately calculated thereon. No present contention of bad faith is advanced. All three of the challenged expenditures were made for legitimate airport objectives. The fact that part of the land in Bird Island flats, filled with the view of making usable land available to the airlines at their request, is presently unutilized does not prevent its cost from being calculated in the base amount on which the landing fee is allocated. The fact that circumstances forced a change in plans for the runway extensions and the abandonment of STOL similarly does not make improper the inclusion of these costs. And the contract for medical services in connection with an airport disaster plan is not beyond the proper range of judgment of the airport management.

We have one final observation. In-state users are of course in no position to argue that application of the tax to them violates the commerce clause. Acceptance of plaintiffs' claims would therefore require in-state users to pay a disproportionate share of the cost of airport operations. While the commerce clause bars discrimination against interstate commerce, it cannot be invoked to require discrimination in favor of it.

There being no material issue of fact in dispute, the court did not err in granting summary judgment.

*Affirmed.*