**ISLAND AVIATION, INC., Plaintiff,**

v.

**GUAM AIRPORT AUTHORITY, a public corporation, et al., Defendants.**

Civ. No. 81–0063.

United States District Court,
D. Guam.

Oct. 14, 1982.

---

Vernon F.L. Char, Damon, Key, Char & Bocken, Honolulu, Hawaii, William J. Blair, Klemm, Blair & Barusch, Agana, Guam, for plaintiff.

Lawrence J. Teker, Gayle, Teker & Schnabel, Agana, Guam, for defendants.

## MEMORANDUM ORDER

DUENAS, District Judge.

This case is before the court on Defendants' motion for summary judgment and Plaintiff's cross motion for partial summary judgment. Both motions are brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The only issue before this court is whether certain service charges imposed by the Guam Airport Authority (hereinafter referred to as "GAA"), pursuant to their rules and regulations, are prohibited charges under 49 U.S.C. § 1513(a).

The service charges in question are entitled the "Departure Facility Service Charge" which includes the "Sterile Room Holding Service Charge", and the "Arrival Facility Service Charge" and are set out as follows:

"1100.2. DEPARTURE FACILITY SERVICE CHARGE

All Guam originating revenue passengers carried for hire from the Air Terminal shall be processed through the Departure Building and Sterile Area facilities and, to cover costs of operations and maintenance thereof, a service charge calculated on the basis of $.75 per revenue passenger shall be paid to the Air Terminal by the aircraft operator transporting said passengers from Guam.

Exceptions: Bonafide airline, air taxi and charter tenants of Authority in the Air Terminal operating under the terms of a valid lease.

1100.5. ARRIVAL FACILITY SERVICE CHARGE

All Guam terminating passengers carried for hire arriving at the Air Terminal shall be processed through the Arrival Building facilities, and to cover the costs of providing, operating and maintaining said facilities, a service charge calculated on the basis of the number of arriving passengers (revenue) using said facility shall be paid to the Air Terminal by the aircraft operator transporting said passengers to Guam. The fee shall be exactly the same currently being paid by airline tenants of the Authority at the Air Terminal.

Charges for use of the arrival facilities include the use of the bag conveyor and claim counter, and of the federal inspection and public space associated with these facilities, including the restrooms and arrival processing area. Personnel required to handle bags from the inbound conveyor to the claim counter are provided by the Air Terminal and are included in this charge. Each aircraft operator must provide staff to handle bags from the aircraft to the external (reception) portion of the conveyor outside the Arrival Building.

NOTE: Bonafide airline, air taxi and charter of the Authority in the Air Terminal shall be exempt from the $10.00 per aircraft arrival charge, but shall be subject to the Arrival Facility Service Charge."

The Plaintiff Island Aviation, Inc., is not required to pay the Departure Facility Service Charge since it is a charter tenant of the Authority in the Air Terminal and thus, specifically exempted from this charge. However, in lieu of the Departure Facility Service Charge, Plaintiff is required to pay the Sterile Room Holding Service Charge. Plaintiff must also pay the Arrival Facility Service Charge.

The Arrival Facility Service Charge is calculated on the basis of $1.65 per each Guam terminating revenue passenger processed through the Arrival Building facilities to be paid by the aircraft operator.

The Sterile Room Holding Charge is calculated according to the following formula:

RENTAL COMPUTATION—DEPARTURE LOUNGE AND PASSENGER SECURITY INSPECTION AREAS

Total Rental:

| | | |
|---|---|---|
| 8,761 Square Feet @ $9.50 | $83,229.50 Annual | |
| | $ 6,935.79 Monthly | |

Payment Computation:

1. 20% Equally dividend (sic) among Signatory Airlines *

$83,229.50 × 20% = $16,645.90 divided by 12 = $1,387.16 Monthly

$1,387.16 divided by 3 = $462.69 Fixed Monthly Rental each Airline

2. 80% Prorated among Signatory Airlines on the basis of each Airline's percentage of deplaning passengers as the same relates to the total of all Signatory Airlines deplaning passengers.

3. Prorated rental ($83,229.50 × 80% = $65,583.60 divided by 12 = $5,548.63 Monthly) is reduced by all amounts collected by GAA for the use of the area by non-signatory aircraft operators as follows:

(i) Permittee carriers (local service operators of aircraft under 50,000 pounds gross takeoff weight)—to be charged a fee for each departing passenger equal to the average fee charged to Airline for its passengers plus 5¢; to be recomputed every six months (January and July)

(ii) Non-tenant, non-signatory aircraft operators to be charged a fee of 75¢ per departing passenger

(iii) All intransit fees collected from any non-signatory aircraft operator in accordance with the prevailing fee schedule established in GAA's Rules and Regulations from time to time

4. Percentages of deplaning passengers to be used for rental billing purposes (paragraph 2 above) to be recomputed each six months (January and July) which are not affected by any service interruption using the previous six month period.

Plaintiff, which is a permittee carrier was assessed Sterile Room Holding Facility Service Charges ranging from $.36 to $.57 per passenger. However, during the course of this litigation, the Authority admitted that it had miscalculated those charges and the current charge to be paid by the Plaintiff is $.29 per passenger.

The Plaintiff alleges that the above Sterile Room Holding Charges and the Arrival Facility Service Charges are head charges prohibited by 49 U.S.C. § 1513(a) which states:

"§ 1513. State taxation of air commerce

Prohibition: exemption

(a) No State (or political subdivision thereof, including the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the District of Columbia, the territories or possessions of the United States or political agencies of two or more States) shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom; except that any State (or political subdivision thereof, including the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the District of Columbia, the territories or possessions of the United States or political agencies of two or more States) which levied a tax, fee, head charge, or other charge, directly, or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom prior to May 21, 1970, shall be exempt from the provisions of this subsection until December 31, 1973."

Defendants, on the other hand, contend that the Sterile Room Holding Charges and the Arrival Facility Service Charges are not prohibited by § 1513(a) since they are service charges collected from aircraft operators for the use of airport terminal facilities and thus, fall within the exception of 49 U.S.C. § 1513(b). Section 1513(b) states in full:

"Permissible State taxes and fees

(b) Nothing in this section shall prohibit a State (or political subdivision thereof,

---

* Signatory Airlines consist of Continental/Air Micronesia Airlines, Japan Airlines and Pan American World Airways.

including the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the District of Columbia, the territories or possessions of the United States or political agencies of two or more States) from the levy or collection of taxes other than those enumerated in subsection (a) of this section, including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and nothing in this section shall prohibit a State (or political subdivision thereof, including the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the District of Columbia, the territories or possessions of the United States or political agencies of two or more States) owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities."

The Plaintiff has made a well-presented and novel argument in support of its contention that per passenger service charges are flatly prohibited under 49 U.S.C. § 1513(a); however, after careful review and consideration of the plain terms of § 1513(a) and (b) and its legislative history, this court must reject Plaintiff's argument since it is of the opinion that the Sterile Room Holding Charges and the Arrival Facility Service Charges are valid and legal service charges imposed on aircraft operators for the use of airport facilities and specifically exempted from the § 1513(a) prohibition pursuant to § 1513(b).

Since the issue is one of first impression, the court will examine the question at some length.

In 1970, the Committee on Commerce and the United States Congress passed the Airport and Airway Development Act in order to provide for improvements in the national air transportation system. Congress created an Aviation Trust Fund which was funded by an eight percent (8%) user charge on domestic passengers, and $3.00 per person on international tickets. The whole concept underlying the Airport and Airway Development Act was uni-formity and the maintenance of a national air transportation system.

S.Rep. No. 93–12, 93d Cong., 1st Sess., reprinted in (1973) U.S.Code Cong. & Ad. News 1434–1463.

In 1972, the Supreme Court decision in *Evansville-Vanderburgh Airport Authority District, et al. v. Delta Airlines, Inc., et al.,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972), upheld passenger head taxes enacted by New Hampshire and by Evansville, Indiana, for "aviation-related purposes". The Court concluded " . . . that the provisions before us impose valid charges on the use of airport facilities constructed and maintained with public funds." *Id.,* p. 720, 92 S.Ct. p. 1357. The Court further stated, " . . . we do not think that they conflict with any federal policies furthering uniform national regulation of air transportation. No federal statute or specific congressional action or declaration evidences a congressional purpose to deny or pre-empt state and local power to levy charges designed to help defray the costs of airport construction and maintenance." *Id.,* pp. 720–721, 92 S.Ct. pp. 1357–1358.

In response to the above Supreme Court decision, the Senate introduced bill S. 3755 in 1972 to amend the Airport and Airway Development Act of 1970 and the Federal Aviation Act of 1958. The Conference report was approved by both houses; however, President Nixon vetoed bill S. 3755 on the ground that the total appropriation for airport development was too high. 118 Cong.Rec. 35116, 36860–62. On February 1, 1973, the Senate Commerce Committee reported S. 38, a bill substantially identical to the Conference report version of S. 3755, except for a lower appropriation figure for airport development. S.Rep. No. 93–12, 93d Cong., 1st Sess., reprinted in (1973) U.S. Code Cong. & Ad.News 1434–1463. As reflected in the Legislative History of S. 38, Congress was concerned about the effect the Supreme Court decision would have on other states and local governments enacting head taxes or fees on air travelers and the obvious lack of guidelines and safeguards to insure that the funds collected would be

used for aviation-related purposes and that a reasonable and nondiscriminatory tax would be imposed so as to prevent financial windfalls. S.Rep. No. 93–12, 93d Cong., 1st Sess., reprinted in (1973) U.S.Code Cong. & Ad.News 1446.

As reflected in the discussion in the Senate of S. 38, a part of which became 49 U.S.C. § 1513, the legislators indicated that the Supreme Court had misread the intent of Congress in enacting an eight percent (8%) user tax on all airline tickets to finance the Federal Trust Fund and felt compelled to clarify the Congressional intent so as to resolve the problem of double taxation. The discussion of two managers of Senate Bill 38, as reported in 119 Cong.Rec., pp. 3349–3350 (1973), includes the following:

"(MR. CANNON):

Finally, Mr. President, S. 38 prohibits a new, inequitable, and potentially chaotic burden of taxation on the nearly 200 million persons who use air transportation each year. The bill prohibits the levying of State or local head taxes, fees, gross receipts taxes or other such charges either on passengers or on the carriage of such passengers in interstate commerce.

· In 1970, Congress established a national, uniform system of user taxation on all users of the air transportation system and levied a tax of 8 percent on all airline tickets. That user tax was intended to finance aviation facilities development through a national program and Congress intended at the time that the Federal tax be the only tax on airline passengers.

Last year, however, the U.S. Supreme Court upheld the validity of several State and local passenger head taxes, overturning a precedent established more than a hundred years ago.

Since that time many communities have enacted passenger head taxes of one kind or another which vary in rate, scope and applicability. The committee views these taxes as an unnecessary and discriminatory burden on passengers in air transportation and as a form of double taxation which we did not intend when in 1970, we enacted a national system of aviation user taxation.

Presently, at least 31 different government jurisdictions have levied head taxes and many other communities are in the process of doing so or are seriously considering it. We believe this proliferation of local taxes can and will undermine a sound national transportation system by causing confusion, delay, inequities, and discrimination in air transportation and must be prohibited before it gets any further out of hand. There is no need for two systems of user taxation; particularly in light of the increased Federal assistance to airports provided for in this bill . . . .

By prohibiting State taxation on passengers or on air transportation, the committee has accepted greater responsibility for U.S. assistance. With the increased Federal assistance, we can see no valid reason for the continuance of local passenger taxation."

"(MR. PEARSON):

Finally, Mr. President, the committee bill prohibits State and local taxation of air fares. The Congress intended in 1970 to preempt the States and localities from levying such taxes, as taxation on air fares is one of the predominant sources of revenue for the trust fund. Recent Supreme Court decisions necessitate the clarification of this congressional policy determination.

If more than 500 localities—or even a significant proportion of this number—were unilaterally to levy taxes on airline passenger fares, there would result an unconscionable and unacceptable burden on interstate commerce. The national system of air service upon which 180 million airline passengers depend annually would become a hodgepodge of Balkanized assessments and levies against nonresident travelers whose business or leisure takes them across State lines. The committee bill prohibits State and local taxation of air fares, but this Federal preemption is carefully balanced by substantial increases in trust fund assistance for airport development and modernization."

■ As set forth in the Legislative History of S. 38 and emphasized by the Managers of the Senate bill, the purpose behind Congress enacting 49 U.S.C. § 1513(a) was to prohibit a tax, fee, head charge, or other charge imposed by a state, territory, or possession of the United States, on the transaction of engaging in air transportation, whether such charge is levied or collected, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom, since the federal government has already assessed and collected such charge from airline passengers to fund the Federal Trust Fund and it would be an undue burden on airline passengers to be subjected to double taxation by state and local governments.

■ As the Plaintiff correctly argues, Congress increased federal funding for airport development to offset any loss of revenue to local airports as a result of the prohibition of state and local head taxes. S.Rep. No. 93–12, 93d Cong., 1st Sess., reprinted in (1973) U.S.Code Cong. & Ad. News 1455. The problem, however, lies with the definition of the term "airport development" as set forth in 49 U.S.C. § 1711(3) of the Airport and Airway Development Act. This definition does not include terminal buildings or facilities. The Senate in S. 38 proposed an amendment to include language relating to the construction, alteration, repair, or acquisition of airport terminal buildings or facilities directly related to the handling of passengers or their baggage and to make such facilities eligible for federal financial assistance, but the House did not include such provisions in H.R. 6388 and the Conference Report which was approved by both Houses, omitted the provisions of the Senate bill relating to terminal facilities. 119 Cong.Rec. 18046 & 18047 (1973). Thus, airport terminal buildings and facilities are ineligible for federal financial assistance, whether such assistance be for construction, alteration, repair, acquisition, maintenance or operational costs.

■ It is the opinion of this court that since Congress has not provided federal funding for the development, maintenance and operating costs of airport terminals, it is reasonable to conclude that by enacting § 1513(a) Congress did not intend to deprive airports of assessing and collecting the necessary funds to finance such terminals. Such conclusion is supported by the enactment of § 1513(b) which provides in pertinent part:

"... and nothing in this section shall prohibit a State (or political subdivision thereof, including ... Guam ...) owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities."

■ This now leads the court to discuss the Departure Facility Service Charge which includes the Sterile Room Holding Charge, and the Arrival Facility Service Charge imposed by GAA.

The Plaintiff contends that these "alleged service charges" are in actuality, enplanement and deplanement fees charged by the airport authority and prohibited head taxes under § 1513(a), not falling within the scope of the exception to the prohibition under § 1513(b). This court does not agree with Plaintiff's contention. The Departure Facility Service Charge which includes the Sterile Room Holding Charge is imposed on aircraft operators to cover the costs of operating and maintaining the Sterile Room Holding Area and is calculated for permittee carriers on the basis of the number of departing passengers all of which are required to be processed through such area pursuant to Rule 1100.2 of GAA Rules and Regulations in accordance with 49 U.S.C. § 1357, while the Arrival Facility Service Charge is imposed on aircraft operators to cover the costs of providing, operating and maintaining the Arrival Building facilities and is "... calculated on the basis of the number of arriving passengers (revenue) using said facility..." pursuant to § 1100.5 of GAA Rules and Regulations which requires all terminating passengers carried

for hire arriving at the Guam International Airport Terminal to be processed through such Arrival Building facilities.

Thus, it is the cost of operating and maintaining the Departure Facility Service Area and the Sterile Room Holding Area, and the cost of providing, maintaining and operating the Arrival Facility Service Area that triggers the service charges to the aircraft carriers; not the act of enplanement or deplanement. Additionally, as the court has previously stated, the Guam International Airport Terminal does not receive any federal funding assistance to help defray the costs of providing, maintaining and operating its terminal building and its facilities. Therefore, this court holds that the Departure Facility Service Charge which includes the Sterile Room Holding Charge, and the Arrival Facility Service Charge imposed by GAA on aircraft operators are valid and legal service charges pursuant to 49 U.S.C. § 1513(b).

The Plaintiff then argues that even if the charges imposed by GAA on the Plaintiff are determined by the court to be service charges for the use of airport facilities pursuant to § 1513(b), these service charges cannot be measured on a per passenger basis. The court again disagrees with the Plaintiff. The court can reasonably infer from the language of § 1513(b) that Congress did intend to limit the type of service charge and the manner in which such service charge could be imposed by the airports, that is, it could only be a *reasonable service charge* collected from *aircraft operators* for the use of airport facilities. However, Congress did not expressly impose guidelines or restrictions on the airports in determining how to measure a reasonable charge.

In fact, the original bill section, Section 1113, proposed to Congress to amend Section 7(a), Title XI, of the Federal Aviation Act of 1958 to prohibit certain state and local taxation of persons in air transportation (cited as 49 U.S.C. § 1513(a) and (b)—Federal Aviation Act) expressly restricted the manner in which service charges could be measured and read as follows:

"SEC. 1113. No state (or political subdivision thereof) shall levy or collect a tax, fee, head charge or other charge, directly or indirectly, on persons traveling in air transportation or the carriage of persons in air transportation, or on the gross receipts derived therefrom, provided, however, that nothing herein shall prohibit a State (or any subdivision thereof) from the levy or collection of taxes other than those enumerated above, including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services (other than on the sale of interstate air transportation or any portion thereof); and further provided, that nothing herein shall prohibit a State (or political subdivision thereof) owning or operating an airport from the levy or collection of reasonable rental charges, landing fees, and other service charges for the use of airport facilities (measured on other than a per passenger basis)."

However, the Senate Committee on Commerce amended the above originally proposed § 1113 by deleting the last phrase "(measured on other than a per passenger basis)" and recommended § 1113(a) and (b) be adopted to amend the Federal Aviation Act of 1958 (now cited as § 1513(a) and (b) of the Federal Aviation Act in lieu of § 1113). The Commerce Committee proposal of § 1513(a) and (b) was then enacted by both Houses. 119 Cong.Rec.—Senate 18046 and 18047 (1973) and 119 Cong.Rec.—House 17345 (1973).

The Plaintiff argues in his supplementary memorandum filed June 16, 1982, as to the above Committee amendment, that S. 3755 was considered by the Senate Commerce Committee, and was favorably reported with one substantive amendment deleting Section 3(b)(2) and other technical or drafting amendments.

Plaintiff contends that the technical or drafting amendment deleting the phrase "(measured on other than a per passenger basis)" was due to the redundancy of the phrase. This court does not agree. It is of the opinion that the Committee was aware

that even if the service charges permitted pursuant to § 1513(b) were levied against the airline operators it would not be economically feasible for them to bear the cost, and ultimately, the passenger would bear the burden of the service charge. The knowledge of the Committee is reflected in the Legislative History of the Airport Development Acceleration Act of 1973 as it relates to head taxes as follows:

"... And if head taxes are absorbed by the carriers, where law permits, ... it will still lead to increased air travel costs. If the carriers had to absorb $1 for every air passenger carried last year, that would amount to $170 million. The airlines could not reasonably be expected to bear such a burden. In the end, a fare increase would have to be implemented...." S.Rep. No. 93–12, 93d Cong., 1st Sess., reprinted in (1973) U.S.Code Cong. & Ad.News 1451.

Therefore, the court believes that the Committee deleted "(measured on other than a per passenger basis)" since it was aware that whether the airport owners levied the service charges to aircraft operators on a per passenger basis or otherwise, the effect would be the same—increased air fares.

Thus, it is the Court's decision that the Committee's deletion of "(measured on other than a per passenger basis)" does not change the substance of § 1513(b) for the GAA may still levy and collect reasonable service charges from aircraft operators for the use of airport facilities and must determine under its particular circumstances what would be the most reasonable measurement of the § 1513(b) service charge.

This interpretation of the amendment of § 1513(b) is consistent with 49 U.S.C. § 1718(a)(8) of the Airport Development Act of 1970 which still requires the airport operator or owner to "maintain a fee and rental structure for the facilities and services being provided the airport users which will make the airport as self-sustaining as possible under circumstances existing at that particular airport, taking into account such factors as the *volume of traffic* and

economy of collection..." as a condition precedent to the Secretary's approval of an airport development project. (Emphasis added).

In addition to the airport operator or owner taking into account such factors as the volume of traffic and economy of collection to maintain a self-sustaining fee and rental structure for the facilities and services being provided the airport users, he must also make certain "the airport ... will be available for public use on fair and reasonable terms and without unjust discrimination, including the requirement that (A) each air carrier, ... using such airport shall be subject to nondiscriminatory and substantially comparable rates, fees, rentals, and other charges and nondiscriminatory and substantially comparable rules, regulations and conditions as are applicable to all such air carriers which make similar use of such airport and which utilize similar facilities, subject to reasonable classifications..., and (B) each fixed-based operator using a general aviation airport shall be subject to the same rates, fees, rentals and other charges as are uniformly applicable to all other fixed-based operators making the same or similar uses of such airport utilizing the same or similar facilities". 49 U.S.C. § 1718(a)(1).

■ Thus, reading 49 U.S.C. § 1513(a) and (b) together with 49 U.S.C. § 1718(a)(1) and (a)(8), the court determines that the airport owner may not "levy or collect a fee or other charge, directly or indirectly, on persons traveling in air commerce" (49 U.S.C. § 1513(a)), but an airport operator may, and effectively must, levy and collect, by means of a nondiscriminatory formula, (49 U.S.C. § 1718(a)(1)), calculated by "taking into account such factors as the volume of traffic" using the facilities, (49 U.S.C. § 1718(a)(8)), "reasonable rental charges, landing fees and other service charges" (49 U.S.C. § 1513(b)), as may be necessary to "make the airport as self-sustaining as possible." (49 U.S.C. § 1718(a)(8)).

Although this court is not at liberty to determine whether the per passenger service charges imposed by GAA on aircraft

operators are reasonable or nondiscriminatory since it was not alleged in Plaintiff's complaint, the court does feel that it is important to note that the District Court for the Northern District of Georgia in *Southern Airways, Inc. v. City of Atlanta, et al.,* 428 F.Supp. 1010 (N.D.Ga., 1977), addressed this issue. In *Southern Airways, Inc.,* the court held that the 40% portion of a formula employed by the airport owners to allocate the rental associated with the common area in the terminal and the cost of operations and maintenance at the Atlanta Airport which was based on the number of enplaned passengers, was not discriminatory.

This court stresses that it is not ruling that service charges formulated on a per passenger basis are the most equitable or reasonable method of measuring the service charges on aircraft operators for the use of airport facilities at the Guam International Airport Terminal. This court does not even address the issue. If the Plaintiff believes the service charges imposed by GAA exceed the actual cost of operation and maintenance of the Departure Facility Area, Sterile Room Holding Area and the Arrival Facility Area, the service charges must be challenged on the basis of reasonableness.

This court concludes, on the basis of all memoranda, affidavits, and depositions submitted by the parties and after complete and careful examination of 49 U.S.C. § 1513(a), § 1513(b), § 1718(a)(1) and § 1718(a)(8), and its Legislative History, that the Departure Facility Service Charges, the Sterile Room Holding Charges and the Arrival Facility Service Charges imposed on aircraft operators by GAA for the use of airport facilities are service charges pursuant to § 1513(b) and that such service charges measured on a per passenger basis are *not* "head taxes" prohibited by Congress under § 1513(a).

Based on the foregoing, the Summary Judgment Motion of the Defendant Guam Airport Authority is hereby granted. However, we do permit the Plaintiff, on the basis of its oral motion at the Summary Judgment hearing, if it so desires, to amend its complaint to raise the issue as to the reasonableness of the service charges imposed by GAA.

IT IS SO ORDERED.

LET JUDGMENT ISSUE.