**STATE OF MAINE, et al., Plaintiffs,**

**v.**

**DEPARTMENT OF the NAVY, et al., Defendants.**

**Civ. No. 86–0211–P.**

United States District Court, D. Maine.

Nov. 23, 1988.

Marcia J. Cleveland, Asst. Atty. Gen., Augusta, Me., for plaintiffs.

David R. Collins, Asst. U.S. Atty., Portland, Me., F. Henry Habich, II and Mary Elizabeth Ward, Attys., U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Washington, D.C., for defendants.

## OPINION AND ORDER ACTING UPON THE MAGISTRATE'S RECOMMENDED DECISION ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

GENE CARTER, District Judge.

### I.

This matter is before the Court on objections filed to the Magistrate's Recommended Decision on Defendants' Motion for Partial Summary Judgment. A hearing on the motion was held before the Honorable D. Brock Hornby, United States Magistrate. The United States Magistrate filed with the Court on November 16, 1987, with copies to counsel, the Recommended Decision referred to. In the Recommended Decision, the Magistrate recommends that the Defendants' Motion for Partial Summary Judgment be denied except as to the State's claim under the Oil Discharge Prevention and Pollution Control Act, as to which claim, the motion be granted.[1]

---

1. On June 6, 1988, the parties filed a Stipulation of Dismissal With Prejudice of Plaintiff's claim for civil penalties for violation of the Maine Oil Spill Prevention and Pollution Control Act, set forth in paragraphs 55 and 56 of the Second Amended Complaint and paragraph 7 of the Relief Clause of that complaint. This stipulation moots the portion of the summary judg-

On November 27, 1987, Defendants filed timely objections to the Recommended Decision to the extent that it recommends

(1) that Maine be permitted to recover civil penalties from the Defendants pursuant to Maine's hazardous waste statute, Me.Rev.Stat.Ann. Title 38, §§ 1301 to 1319–K (Supp.1985) notwithstanding the lack of any clear and unequivocal waiver of sovereign immunity under the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6921–6934;

(2) that Maine be permitted to recover a penalty of triple fees pursuant to Me. Rev.Stat.Ann. Title 38, §§ 348, 1319–I(6), from the Defendants for failure to pay certain hazardous waste generator or operator fees, again notwithstanding the lack of a waiver of sovereign immunity under RCRA;

(3) that Maine be permitted to recover "fees" against the Defendants pursuant to Me.Rev.Stat.Ann. Title 38, §§ 1319–H, 1319–I, "fees" which are an unconstitutional tax against an instrumentality of the United States because no benefit accrues to Defendants from the payment of such "fees"; and

(4) that Defendant's [sic] Motion for Partial Summary Judgment be denied on the issue of whether the "fees" Maine seeks to recover against the Defendants are an unconstitutional tax against the United States because further factual development is needed and because the Court could attempt to rewrite the tax to make it a fee.[2]

Defendants' Objections to Magistrate's Recommended Decision at 1–2.

Plaintiffs also filed timely objections to the Recommended Decision on December 2, 1987, which objections read as follows:

(1) Plaintiffs object to the Recommended Decision of the Magistrate if it is read to suggest that waivers of sovereign immunity must be read strictly to favor the federal government. Plaintiffs argue that the federal facilities provision of the Resource Conservation and Recovery Act (42 U.S. C. § 6961) must be read fairly to effectuate the intent of Congress, that federal facilities comply with state hazardous waste law.

(2) Plaintiffs object to the statements in the Recommended Decision that the legislative history of the federal facilities provision is unclear or confusing. Plaintiffs contend that the available legislative history supports the imposition of civil penalties in this case.

(3) Plaintiffs object to the Recommended Decision to the extent that it states in dicta that the doctrine of sovereign immunity may be applied to a state in an action to enforce state law. This case presents a question of the proper relationship between the sovereignty of the state and federal governments, which should be decided on the explicit constitutional provisions governing that relationship.

(4) Plaintiffs object to the holding in the Recommended Decision that the term "reasonable service charges" means "a charge for having a service available" and the Decision's reliance on

ment motion which the Magistrate recommended be granted.

**2.** Defendants explicitly note that

they agree with the Magistrate's Recommended Decision to the extent that the Magistrate concludes (1) that the sovereign immunity doctrine does apply when determining whether a state may impose civil penalties on a federal facility, *see* Magistrate's Recommended Decision at 4 n. 3; (2) that Defendants' Motion for Partial Summary Judgment should be granted with respect to the State of Maine's claim for civil penalties under the Oil Discharge Prevention and Pollution Control

Act ... (3) that the Federal Clean Water Act, 33 U.S.C. §§ 1251–1376, does not provide a waiver of sovereign immunity with respect to the recovery by the states of civil penalties against federal facilities under corresponding state water pollution control acts; ... and (4) that the phrase "reasonable service charges" in section 6001 of RCRA, 42 U.S.C. § 6961, does not encompass the generator or operator "fees" that the State of Maine seeks to recover from the Defendants....

Defendants' Memorandum in Support of Their Objections (Docket Item No. 5), at 2.

utility cases to support this interpretation. Plaintiffs argue that the term "service charges" means a fee designed to cover the cost of a State's hazardous waste regulatory program, including the cost of processing licenses and ensuring compliance with them and regulations.

(5) Plaintiffs object to the Recommended Decision to the extent it appears to limit the State's proof that its fees are reasonable to a comparison between the cost of the hazardous waste response team and the benefit of that hazardous waste response capability to generators. Plaintiffs argue that the annual and generator fees are used both to pay some of the costs of Maine's hazardous waste regulatory program and to support the hazardous waste spill response team. Plaintiffs intend to prove at trial that the portion of the fees used to cover the costs of the regulatory program are reasonable in light of the cost of that program. The State will also introduce evidence on the cost of the hazardous waste response team and the cost of the benefits it confers upon generators.

Plaintiff's Objection to Magistrate's Recommended Decision at 1–3.

This Court has now reviewed and considered at length the Magistrate's Recommended Decision, together with the entire record made in the case, including the written objections of the Plaintiffs and of the Defendants and the memoranda submitted by counsel before the Magistrate and in this Court. The Court, having considered and made a *de novo* determination of all matters adjudicated by the Magistrate's Recommended Decision *to which objection has been made, see* 28 U.S.C. § 636(b)(1)(C) and *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 605 (1st Cir.1980), now renders its opinion and order acting upon the Magistrate's Recommended Decision herein.

## II.

This action was commenced by the State of Maine and Maine's Board of Environmental Protection against the Department of the Navy (hereinafter referred to as "the United States"), which owns and operates the Portsmouth Naval Shipyard in Kittery, Maine. Plaintiffs filed the action in York County Superior Court, seeking an order which required "the Shipyard to handle hazardous waste in compliance with Maine's hazardous waste laws and regulations, to pay fees into Maine's Hazardous Waste Fund on the same basis as other generators and operators of hazardous waste facilities, ... to report and clean up oil spills in compliance with Maine's oil pollution laws and regulations" and to pay civil penalties for past violations from 1981 forward. Complaint ¶ 1. The action was removed by the United States to this Court and the Complaint was amended to add the Department of Defense as a defendant. The Defendants filed a motion for partial summary judgment which generates two issues, ruled upon by the Magistrate in the Recommended Decision;[3] namely, (1) whether, assuming *arguendo* that the shipyard has violated Maine laws, it can be compelled to pay the civil penalties prescribed by the state statutes, and (2) whether the fees sought by the State constitute a "tax" which the State is constitutionally prohibited from imposing on the United States.

## III.

With respect to the first issue, the Magistrate concluded that the Resource Conservation and Recovery Act, 42 U.S.C. § 6961, does permit, in clear language, the recovery of civil penalties by a state administrative agency against the federal government independently of court-enforced injunctive relief. Accordingly, the Magistrate recommended that the Defendants' motion for partial summary judgment be denied insofar as civil penalties are concerned.

The Court concurs with the result reached by the Magistrate but finds much less occasion for the analytical uncertainty

**3.** The Magistrate's Recommended Decision is set forth in full in Appendix A.

exhibited by the Recommended Decision. The issue arises under section 6961 of the Resource Conservation and Recovery Act, which reads in pertinent part as follows:

§ 6961. Application of Federal, State, and local law to Federal facilities

Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any solid waste management facility or disposal site, or (2) engaged in any activity resulting, or which may result, in the disposal or management of solid waste or hazardous waste shall be subject to, and comply with, *all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions or injunctive relief and such sanctions as may be imposed by a court to enforce such relief)*, respecting control and abatement of solid waste or hazardous waste disposal in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges. Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal Court with respect to the enforcement of any such injunctive relief.

42 U.S.C. § 6961 (emphasis added). After setting out the language of the statute, the Magistrate states his immediate conclusion, with which this Court wholeheartedly concurs; namely, "an intelligent person reading the statute would think the message plain: federal facilities will be treated the same as private institutions so far as enforcement of the solid waste and hazardous waste laws are concerned.... It is hard to imagine clearer language short of listing every possible variation of such requirements." Recommended Decision at 3. The Magistrate then undertakes a discussion of the case law, notably *Hancock v. Train*, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976), and its progeny, and a consideration

of the impact of congressional action subsequent to that decision in respect to several different federal environmental statutes.

This Court is fully persuaded that the use of the language "all Federal, State, interstate, and local requirements, both substantive and procedural" used in section 6961 imposes upon federal facilities civil penalties provided for in the pertinent state regulatory act.[4] By the language, Congress gave a clear and explicit waiver of immunity to a generic category of "requirements" broad enough to include, by any fair construction, civil penalties. The word "requirement" is defined in accepted usage as "something called for or demanded: *a requisite* or essential condition...." (emphasis added). *Webster's Third New International Dictionary* at 1929 (3d ed. 1981). A "requisite" is defined as "required by the nature of things or by circumstances or by the end in view: ESSENTIAL, INDISPENSABLE, NECESSARY...." *Id.* The verb form "to require" means "to impose a compulsion or command upon (as a person) to do something; demand of one that something be done or some action taken: enjoin, command, or authoritatively insist (that someone do something)." *Id.*

The civil penalties at issue here, *see* Complaint at ¶ 2, are those imposed by 38 M.R.S.A. § 349(2), which provides:

2. Civil penalties. Any person who violates any provision of the laws administered by the department or terms or conditions of any order, regulation, license, permit, approval or decision of the board shall be subject to a civil penalty, payable to the State, of not less than $100 nor more than $10,000 for each day of that violation, or, if the violation relates to hazardous waste, or not more than $25,000 for each day of the violation.

38 M.R.S.A. § 349(2). The penalties authorized by the statute are obviously a form of enforcement requirement intended "to impose a compulsion or command upon [someone] to do something" as the circumstances may require. *Webster, id.* They are clearly "called for," *id.*, to enforce Maine's environmental laws. They may be "required

---

**4.** 38 M.R.S.A. § 349(2).

... by the circumstances or by the end in view." *Id.* Both generically and specifically, such civil penalties are clearly encompassed within the language "all ... requirements, both substantive and procedural."

Having waived immunity explicitly, albeit generically, to the specified "requirements," there was no need for Congress to proceed to describe an explicit waiver of every conceivable "requirement" comprehended in the described generic category, "requirements." Indeed, it would be nonsensical to require Congress to make a detailed punchlist of all of the "requirements" set out in the entire body of environmental law of the federal government and each of the fifty states. Clearly, if Congress may effectively waive sovereign immunity to each individual requirement of state law, which it indisputably can, then it can, with equal effectiveness, waive sovereign immunity to a generic or broad category of state requirements in a single stroke, provided that the waiver is explicitly stated and the category capable of meaningful definition.

Further, it is this Court's view that while those historical and precedential considerations discussed at length by the Magistrate provide a historical context in which one may construe and understand the meaning attributed by Congress to the language in question, they do not generate any uncertainties as to what Congress meant to achieve by the use of the language in section 6961 under discussion here.

The historical context may be briefly outlined. As of the date of the decision in *Train* in 1976, Congress had enacted the Clean Air Act, the Safe Drinking Water Act, and the Clean Water Act. *Train* arose out of a controversy as to whether the provisions of the Clean Air Act subjected federal facilities to state-imposed permit requirements. The language of the Clean Air Act provided:

Each department, agency, and instrumentality of the ... Federal Government ... shall comply with federal, State, interstate and local requirements respecting control and abatement of air pollution to the same extent that any person is subject to these requirements....

42 U.S.C. § 1857f [5] (predecessor to § 7418). Construing this language, the Supreme Court held in *Train* that because the statute in question did "not provide that federal installations 'shall comply with *all* Federal, State, interstate, and local requirements....'" *Train*, 426 U.S. at 182, 96 S.Ct. at 2014 (emphasis in original), the Clean Air Act did not subject federal installations to state permit requirements. *Id.* at 198, 96 S.Ct. at 2021. The Court specifically differentiated substantive from procedural or enforcement requirements in its opinion and concluded that by the language in question, Congress had not explicitly waived federal immunity *as to procedural and enforcement requirements* of pertinent regulatory enactments.

Following the decision in *Train*, Congress enacted, in September of 1976, the Resource Conservation and Recovery Act containing the statutory provision in question in this case. In section 6961, in reaction to the *Train* decision, Congress enacted language clearly intended to obviate the effect of the distinction highlighted in the *Train* opinion upon an effective comprehensive waiver of sovereign immunity. The section was drafted to state that federal facilities will be subject to *"all* federal, state, interstate and local requirements, *both substantive and procedural....*" 42 U.S.C. § 6961 (emphasis added). The following year, Congress added by amendment the substance of the new language to the Clean Air Act, the Clean Water Act, and the Safe Drinking Water Act. While the formulation of the language in the Clean Air Act and the Safe Drinking Water Act contained variations from the specific

---

**5.** The Clean Water Act included virtually identical language, but with the added provision that federal facilities shall pay "reasonable service charges." 33 U.S.C. §§ 1151, *et seq.* (before amendment); P.L. 92–500 § 313, Oct. 18, 1972.

The Supreme Court gave the same constructed interpretation to the Clean Water Act in *EPA v. State Water Resources Control Board,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), as it had given the Clean Air Act in *Train.*

language in section 6961,[6] the Court finds nothing in those formulations that would indicate that the language "any ... requirement whether substantive or procedural" there used was intended to be less generically comprehensive in its import than was the language "all ... requirements, both substantive and procedural" used in section 6961.

It is significant that each of those statutes specifically absolves any "officer, agent or employee of the United States" from personal liability for any civil penalties. This clearly means that even though the words "civil penalties" were not used in the foregoing provisions of the section, the language which was used was contemplated to make the United States liable for such civil penalties; otherwise there would be no need to absolve *individual officers, agents* or *employees* of the United States of "liability for civil penalties." Only the inclusion of civil penalties within the word "requirements" as used in the earlier language of the section would expose a federal employee to "civil penalties for which he is otherwise not liable." Reason favors the

conclusion that all civil penalties were intended to be within the nearly identical "requirements" language of section 6961.

The Magistrate observed that the language of the amended version of the Clean Water Act specifically used the parallel language "any requirement whether substantive or procedural" and also stated in the same section that "the United States shall be liable *only* for those civil penalties arising under federal law or imposed by a state or local court to enforce an order of the process of such court." 33 U.S.C. § 1323(a) (emphasis added). The Magistrate apparently read this latter provision "to preserve explicitly the government's protection against collection of civil penalties except in the pursuit of judicial injunctive relief or in cases of federally-imposed penalties." Recommended Decision at 9. This Court thinks that the methodology by which Congress acted to that end in the Clean Water Act is an important guide to understanding what "requirements" meant as used earlier in that statute and perforce in section 6961 of the RCRA.

**6.** The pertinent parts of these statutes provide:

*Clean Water Act:*
33 U.S.C. § 1323.
(a) Each department, agency, or instrumentality of ... the Federal Government (1) ... and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to and comply with all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner.... *Clean Air Act:*
42 U.S.C. § 7418.
(a) ... Each department, agency, and instrumentality ... of the Federal Government (1) ... and each officer, agent, or employee thereof, shall be subject to, and comply with all Federal, State, interstate, and local requirements, administrative authority, and process

and sanctions respecting the control and abatement of air pollution in the same manner, and to the same extent as any nongovernmental entity. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner.... *Safe Drinking Water Act:*
42 U.S.C. § 300j-6.
(a) Each Federal agency ... shall be subject to, and comply with, all Federal, State, and local requirements, administrative authorities, and process and sanctions respecting the provision of safe drinking water and respecting any underground injection program in the same manner, and to the same extent, as any nongovernmental entity. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process or sanction, whether enforced in Federal, State, or local courts or in any other manner....

The clause in question is not intended to articulate *the imposition* of specific civil penalties under the Clean Water Act upon the United States. The earlier language of the section, "any requirement whether substantive or procedural...." 33 U.S.C. § 1323, had already imposed civil penalties generically upon federal agencies. What the language in question was intended to accomplish, for purposes of the Clean Water Act, was to carve out of the generic categories of civil penalties previously imposed those civil penalties which *did not* arise under federal law or which *were not* imposed by a local court order for enforcement purposes. The provision exempts the United States from liability for those civil penalties, and leaves the residue of the generic category of civil penalties (*e.g.*, those that *arise* under federal law or which *were* imposed by a state or local court) to be borne by the United States. Congress's reasons for limiting the category of civil penalties in the Clean Water Act applicable to the United States and any inquiry into the exceptions are not pertinent to the discussion here.[7] It is clear that Congress had the authority to tailor the category of civil penalties in any way that it saw fit in any of the environmental acts. What is of significance is that it undertook to do so not by changing the generic description of "requirements" set out in the earlier language of the section, which by any normal construction must be taken to include civil penalties, but by describing a separate category of civil penalties within the generic description of those for which liability was imposed. "Only" in this language is clearly used as a word of limitation; thus, the phrase operates to delimit the broader category of civil penalties for which liability had already, in the mind of the draftsman, been imposed by the clear intendment and all-inclusive scope of the earlier "all requirements, substantive and procedural" language.

The ultimate conclusion must be that in drafting of the Clean Water Act, Congress understood that the "all requirements" language used earlier in the section included all civil penalties. Were that not so, Congress would not have appropriately said "the United States shall be liable *only* for those civil penalties...." (emphasis added), but rather would have stated affirmatively "the United States shall be liable for all civil penalties arising under federal law or imposed by a state or local court to enforce an order or process of such court." It cannot escape notice that if it were Congress's intent by this language to affirmatively describe and impose a liability upon the United States, the language would more appropriately have been placed in the early part of the language of section 1323(a), where other affirmative language of imposition is used, rather than where it occurs.

Thus, the appearance of the language in the Clean Water Act that the United States shall be liable only for certain civil penalties is in no way to be taken to indicate that the reference to "all requirements, substantive or procedural" as used in all of the environmental acts, and its parallel use in section 6961, excludes imposition of liability for civil penalties.

■ The historical process by which the language came about makes it clear that when Congress discovered, from the *Train* decision, that it had not used language in the earlier environmental acts sufficient to include "all requirements, substantive and procedural," it proceeded in all of these acts, including section 6961, to include precisely such language. Congress obviously intended by the new enactments that the United States would be responsible for such civil penalties as elements in the generic description of "all ... requirements, substantive and procedural." But most importantly, it appears clear to the Court that the variance in precise formulation of the parallel sections in the various acts, and specifically the language in the Clean Water Act limiting in part the category of civil penalties to be applicable to the United States, does not cast any pall of uncertainty or doubt over the meaning which Congress intended to give, and clearly did give,

---

**7.** See n. 8, *infra.*

to the "all ... requirements, substantive or procedural" language.[8]

■ This Court concludes that the language of 42 U.S.C. § 6961, which subjects federal facilities to "all federal, state, interstate and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions or injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal in the same manner, and to the same extent, as any person is subject to such requirements...." is intended to and is effective to impose liability, by way of an appropriately explicit waiver of sovereign immunity in respect thereto, upon the United States for civil penalties imposed by state law. The recommendation of the Magistrate that Defendants' Motion for Partial Summary Judgment be denied is adopted, on the rationale hereinabove set forth.

### IV. Fees

The second issue raised by the Objections to the Magistrate's Recommended Decision is whether Maine may collect annual and generator fees from the shipyard provided for in 38 M.R.S.A. §§ 1319-H(2) and 1319-I.[9] As the Magistrate stated: "Annual fees are flat fees; generator fees are fees based upon the volume and type of waste which a particular facility generates.

These fees are collected in connection with administration of the state's hazardous waste program." Recommended Decision at 14. They are credited to the Maine Hazardous Waste Fund. 38 M.R.S.A. § 1319-D.

Section 6961 of the Resource Conservation and Recovery Act provides specifically that federal facilities are responsible for "the payment of reasonable service charges." Before the Magistrate, Defendants argued that the annual and generator fees are not a reasonable service charge but rather an unconstitutional tax on the government. The Magistrate found that the fees were not service charges within the meaning of the statute. He found, however, that genuine issues of fact remained as to whether the fees were an unconstitutional tax under *Massachusetts v. United States*, 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978). Plaintiff now argues that the cost of regulation imposed by these fees is a reasonable service charge, or if it is not, it is a constitutionally permissible user fee.

The Court thinks that the parties' argument and the Magistrate's analysis on this point have missed the larger point. As discussed at great length above, federal facilities are subject to *all* state requirements "both substantive and procedural (including any requirement for permits or reporting ...) respecting control and abate-

---

**8.** The Magistrate seems to have assumed that the fact that Congress had opted in the Clean Water Act to impose liability on federal agencies for *some* civil penalties, out of the universe of penalties available under state and federal law, was evidence that Congress did not intend the "all ... requirements, both substantive and procedural" language used in section 6961 to encompass civil penalties. Such is not the case at all. Congress is nowhere obliged to act consistently in all of its enactments concerning the multitude of environmental concerns that are thrust upon its attention. It bears the duty of defining legislative policy on environmental matters and often does so on the basis of its right to find the legislative facts that define policy needs in particular areas, often recognizing distinctions between the needs that may arise and require legislative attention in particular areas of environmental concern. Where the Congress acts through time to deal with a series

of highly disparate and often freestanding environmental subject matters (*e.g.,* air, hazardous waste generation and disposal, water pollution, safe drinking water, etc.), it would be indeed curious if Congress found a uniform statutory reaction or prescription sufficient in its judgment to meet all environmental subjects, needs and problems. Where Congress has indicated its intention in one act by clear and unequivocal, comprehensive, and discrete language sufficient to carry its meaning, that meaning is not necessarily cast in doubt if, without more, Congress elects to change the remedial pattern in responding to the needs of another environmental area.

**9.** The State, under 38 M.R.S.A. § 1319-I(6), also seeks a penalty of triple fees for those fees which are more than six months overdue. The validity of the triple penalty will depend on the validity of the original fees.

ment of solid waste or hazardous waste disposal in the same manner, and to the same extent, as any person is subject to such requirement, including the payment of reasonable service charges." The use of the word "including" makes plain that reasonable service charges are among the requirements federal facilities must meet. Regardless of whether the fees assessed here are reasonable service charges, the larger question to be asked is whether they are requirements respecting control and abatement of solid waste or hazardous waste disposal.

■ The annual fees and generator fees, although treated as a unit by the parties and the Magistrate, are distinguishable. The annual fee is a license requirement. *See* discussion of "requirement," *supra,* at 8; *see also* Hazardous Waste Management Rules, Ch. 856 §§ 13(A)(22) ("The licensees must pay the annual fee as required by 38 M.R.S.A., Section 1319–H(2) and Subsection C, below. *The license is not effective until and unless the annual fee has been paid."*) (emphasis added); 13(C). Section 6961 of the RCRA specifically includes the requirements for permits as an example of those to which federal facilities are subject.

■ A question remains, then, concerning the status of the generator fees. These fees, like the annual fees, are paid into the Hazardous Waste Fund. The Hazardous Waste Fund was established by the legislature "to carry out the department's responsibilities under this subchapter." 38 M.R.S.A. § 1319–D. That statute provides in part that

> [t]his fund shall be charged with the expenses of the department related to this subchapter, including costs of removal or abatement of discharges and costs of the inspection or supervision of hazardous waste activities and hazardous waste handlers.

Section 1319–E(1) specifies the purposes for which money may be disbursed from the Fund:

A. Costs incurred in the removal or abatement of an unlicensed discharge or threatened discharge of hazardous waste. Whenever practical, the depart-

ment shall offer the responsible party the opportunity to remove or abate the discharge or threatened discharge;

B. Notwithstanding paragraph A, disbursements to remove discharges of hazardous waste, which are not sudden and which involve costs exceeding $10,000, may only be expended in accordance with an allocation approved by the Legislature;

C. Costs incurred for the purchase of necessary hazardous waste and waste oil testing, response, inspection and monitoring equipment and supplies, response and compliance personnel and training of personnel in accordance with an allocation approved by the Legislature;

D. Amounts necessary to reimburse municipalities as required by section 1319–R, subsection 3; and

E. Costs incurred in the inspection or supervision of hazardous waste activities and hazardous waste handlers.

By their very terms, these statutes provide funding for control, whether through inspection, monitoring or supervision, and abatement of hazardous wastes. Thus, the generator fees imposed to maintain the Hazardous Waste Fund are procedural requirements respecting control and abatement of solid waste.

The language quoted above was enacted in 1985. Prior to that, the disbursements from the fund were permitted (1) for costs incurred in removal of unlicensed or threatened discharge of hazardous waste, with removal being defined both as treatment or cleanup and action necessary to prevent or minimize danger from a discharge or threatened discharge of hazardous waste; (2) costs incurred in the purchase of necessary hazardous waste and waste oil testing and response equipment and supplies, response personnel and training of response personnel; and (3) amounts necessary to reimburse municipalities. In its previous form, the fund served less to finance direct regulation than to provide the capability to respond to spills. Even in its previous form, the fund was still designed to serve a control and abatement function. As stated in the findings and purpose underpinning

the Hazardous Waste Fund, which remained unchanged from their enactment in 1981,

The Legislature finds that the proper handling of hazardous waste and protection of the natural environment are important to the public health, safety and welfare. The Legislature also finds that spills and unlicensed discharges of hazardous waste may cause damage to owners and users of property, public and private recreational activities, the natural environment, and the general health and safety of citizens of the State. The Legislature further finds that it is in the public interest of the State and its citizens to provide the capability for prompt and effective response to spills and unlicensed discharges....

38 M.R.S.A. § 1319–B.

In discussing reasonable service charges, the Magistrate took a narrow view of the statutory term "respecting control and abatement," finding that it meant "help[ing] control and abate solid or hazardous wastes" in an immediate sense and that provision of a response capability did not help do that. Recommended Decision at 17–18. The Court cannot agree. A fund which provides a capability to respond to hazardous waste spills concerns or regards control and abatement, *see* Webster, *supra*, at 1934 (defining "respecting" as "concerning" or "regarding") since it will be available to control or abate hazardous waste through prompt removal of discharged materials or prevention of threatened discharges if and when the need arises. Given the overall purpose of the RCRA to protect the environment, 42 U.S.C. § 6902, it would be unreasonable to adopt a cramped construction of requirements "respecting control and abatement" which would exclude a requirement of paying into

a fund which serves the same purpose (protecting the environment), 38 M.R.S.A. § 1319–B, by removing or controlling spills or discharges after they have occurred or threatened to occur.

The Court is satisfied, therefore, that Maine's statutory provisions requiring payment of fees to support the Hazardous Waste Fund are requirements respecting control and abatement of hazardous materials.[10] The fees apply to other hazardous waste licensees and generators, and it is clear that the intent of section 6961 is to have federal facilities treated in the same manner "as any person." The RCRA, therefore, authorizes the imposition of the fees used to run Maine's regulatory program through the Hazardous Waste Fund. Although the Court cannot accept the Magistrate's analysis on the issue of fees, it concludes, as the Magistrate did, that summary judgment in favor of Defendants is not appropriate on the claims for fees.[11]

Accordingly, it is ORDERED that the Magistrate's recommendation be, and it is hereby, accepted, and Defendants' Motion for Partial Summary Judgment is hereby DENIED.

## APPENDIX A

### RECOMMENDED DECISION ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The State of Maine and Maine's Board of Environmental Protection commenced this action against the Department of the Navy and the Department of Defense (hereafter the United States) which own and operate the Portsmouth Naval Shipyard in Kittery, Maine. They filed an action in York County Superior Court seeking an order "requiring the [s]hipyard to handle hazardous waste in compliance with Maine's hazardous waste laws and regulations, to pay fees

---

**10.** The Court notes that the Clean Air Act specifically mandates that state plans be approved if the agency administrator determines that the plan, *inter alia,* "requires the owner or operator of each major stationary source to pay to the permitting authority as a condition of any permit required under this act a fee sufficient to cover—(ii) ... the reasonable costs ... of implementing and enforcing the terms and conditions of any such permit...." 42 U.S.C.

§ 7410(a)(2)(K). The RCRA is more general in scope, stating that for a state plan to be approved it "shall provide the establishment of such regulatory powers as may be necessary to implement the plan." 42 U.S.C. § 6943(a)(4).

**11.** In the present posture of the record, the Court does not have before it any cross-motion for summary judgment on behalf of Plaintiffs.

into Maine's Hazardous Waste Fund on the same basis as other generators and operators of hazardous waste facilities, ... to report and clean up oil spills in compliance with Maine's oil pollution laws and regulations" and to pay civil penalties for past violations from 1981 forward. Complaint ¶ 1. The United States removed the action to federal court and has now brought this motion for partial summary judgment. The motion is premised on the argument that (1) regardless of whether the shipyard violated Maine laws it can in no event be compelled to pay the civil penalties; and (2) the fees sought by the state amount to a tax which the state is constitutionally prohibited from imposing on the United States.[1]

### Civil Penalties

The first issue on this motion for partial summary judgment is straightforward: can a state impose a civil penalty upon a federal agency for violations of state hazardous waste laws? The State of Maine wishes to assess penalties against the shipyard "of up to $25,000 for each day of violation of Maine's hazardous waste laws and regulations," pursuant to 38 M.R.S.A. § 349(2). Second Amended Complaint—Prayer for Relief ¶ 5. Since the United States maintains that civil penalties are unconstitutional under any circumstances, the court must assume for purposes of this motion the most flagrant violations on the part of the shipyard.[2]

It is undisputed that any authority the state has to collect civil penalties from the federal government in this matter must be found in a Congressional enactment, the Resource Conservation and Recovery Act. That statute provides that federal facilities shall be subject to:

all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges. Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal Court with respect to the enforcement of any such injunctive relief.

42 U.S.C.A. § 6961. An intelligent person reading the statute would think the message plain: federal facilities will be treated the same as private institutions so far as enforcement of the solid waste and hazardous waste laws are concerned. Indeed, if legislation is considered the means by which the Congress communicates its wishes to the courts and to the country, it is hard to imagine clearer language short of listing every possible variation of such requirements.

The case cannot be resolved quite so easily, however. As the United States points out, in 1921 the Supreme Court confronted a case where the State of Arkansas had prescribed a penalty against railroad carriers who did not pay their employees full wages within seven days after discharge. A discharged employee sought to recover the penalty from a federal agency, the Director General of Railroads, who was in control of the railroads during the First World War when the discharge in question occurred. In the statute providing for wartime operation of the railroads by the Di-

---

**1.** The state no longer seeks to collect amounts under the Oil Discharge Prevention and Pollution Control Act, 38 M.R.S.A. §§ 541–60, and to that extent, therefore, the motion for summary judgment should be GRANTED. I understand from oral argument that there is no longer any separate argument as to any portion of Portsmouth Naval Shipyard which may be outside the federal enclave. *See also* Letter of May 5, 1987 to the Clerk from counsel for the state.

**2.** Additionally, the state seeks a penalty of "triple fees for those [annual and generator] fees which are more than 6 months overdue," as authorized by 38 M.R.S.A. §§ 348 and 1319–I(6). *Id.* at ¶ 6. The triple penalty would depend not only on the recoverability of civil penalties but also on the validity of the original fees, a subject which will be discussed in Part 2 of this opinion.

rector General, Congress had provided in broad language:

> [t]hat carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or Federal laws or at common law ... and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal government....

*Missouri Pacific Railroad Co. v. Ault*, 256 U.S. 554, 558 [41 S.Ct. 593, 595, 65 L.Ed. 1087] (1921). Justice Brandeis held for a unanimous Court that the United States thereby submitted itself to the various state and federal laws which prescribed how the duty of a railroad carrier should be performed and the remedies for failure to perform, but *not* state-imposed penalties:

> there is nothing either in the purpose or the letter of these clauses to indicate that Congress intended to authorize suit against the government for a penalty, if it should fail to perform the legal obligations imposed. The government undertook, as carrier, to observe all existing laws; it undertook to compensate any person injured through a departure by its agents or servants from their duty under such law; but it did not undertake to punish itself for any departure by the imposition upon itself of fines and penalties or to permit any other sovereignty to punish it. Congress is not to be assumed to have adopted the method of fines paid out of public funds to insure obedience to the law on the part of the government's railway employees.

256 U.S. at 563–64 [41 S.Ct. at 597]. *Ault*, read in the context of other judicial pronouncements that any waiver of sovereign immunity cannot be implied but must be unequivocally expressed,[3] *e.g., Army & Air Force Exchange Service v. Sheehan*, 456

U.S. 728, 734 [102 S.Ct. 2118, 2122, 72 L.Ed.2d 520] (1982); *Hancock v. Train*, 426 U.S. 167, 179–80 [96 S.Ct. 2006, 2012–13, 48 L.Ed.2d 555] (1976); *EPA v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 211 [96 S.Ct. 2022, 2027, 48 L.Ed.2d 578] (1976), has led some courts to find the language of the Resource Conservation and Recovery Act insufficient to support state-imposed civil penalties against a federal facility. Although the statute refers to "all" state and local requirements, "both substantive and procedural," the parenthetical which lists some examples refers to "such sanctions *as may be imposed by a court to enforce [injunctive] relief*" (emphasis supplied). Likewise, the succeeding sentence provides that neither the government nor its employees shall be immune from any "*sanction of any state or federal court* with respect to the enforcement of ... *injunctive* relief" (emphasis supplied). This specific language referring to *court*-imposed sanctions to enforce *injunctive* relief has led these courts to conclude that Congress has not sufficiently made clear that other sanctions or penalties may be recovered. *See, e.g., Meyer v. United States Coast Guard*, 644 F.Supp. 221 (E.D.N.C.1986) ("A strict construction of the statute should limit the waiver to those penalties specifically mentioned"); *accord, McClellan Ecological Seepage Situation v. Weinberger*, 655 F.Supp. 601 (E.D.Cal.1986); *cf. California v. Walters*, 751 F.2d 977 (9th Cir.1984) (criminal penalties).

The legislative history casts little light on Congress' intent. Prior to enactment of the statute, the House and the Senate were considering two different approaches. The House Bill, H.R. 14496, exempted federal facilities from state law and enforcement and subjected them to the Environmental Protection Agency's exclusive authority instead. H.R. No. 94–1491, 94th Cong., 2d Sess. 49–51, reprinted in 1976 U.S.Code

---

3. The state has argued that the sovereign immunity doctrine should not apply in this litigation between the state and the federal government. But the Supreme Court has made clear that it does. *Block v. North Dakota*, 461 U.S. 273, 287 [103 S.Ct. 1811, 1819, 75 L.Ed.2d 840] (1983). The Supreme Court's recent decision in *Califor-*

*nia [Coastal] Control Comm'n. v. Granite Rock Co.* [480 U.S. 572, 107 S.Ct. 1419, 94 L.Ed.2d 577] (1987), is not pertinent to this case, for there the court was dealing with whether federal law preempted state law as it applied to private parties.

Cong. & Admin.News 6238, 6287. The Senate version, S. 3622, on the other hand, provided for the application of state law and for state enforcement. S.R. No. 94–988, 94th Cong., 2d Sess. 23 (1976). There was no conference committee or conference report. Instead, the House and Senate apparently worked out a compromise informally. The compromise language—which now appears in the statute—was passed in the House on September 27 and in the Senate on September 30, 1976. Although floor debates confirm the clear intent of the compromise to subject federal facilities to state laws and regulations, 122 Cong. Rec. 32599, 33817, there is no discussion on the issue of civil penalties.[4]

Consideration of this issue within the context of Congress' general treatment of environmental laws yields little additional insight. The story begins in 1970 when Congress for the first time mandated under the Clean Air Act that federal facilities comply with air pollution laws: "Each department, agency, and instrumentality of the ... Federal Government ... shall comply with Federal, State, interstate and local requirements respecting control and abatement of air pollution to the same extent that any person is subject to such requirements...." 42 U.S.C. § 7418 (prior to amendment); P.L. 91–604 December 31,

1970. *See Hancock v. Train, supra,* [426 U.S.] at 169–72 [96 S.Ct. at 2008–09]. In the 1972 adoption of what came to be called the Clean Water Act, Congress included a virtually identical provision with the additional direction that federal facilities pay "reasonable service charges." 33 U.S.C. §§ 1151 *et seq.* (before amendment); P.L. 92–500 § 313 Oct. 18, 1972. Federal facilities contended that this language in the Clean Air Act and Clean Water Act did not require them to abide by state permit and reporting requirements. When the lower courts divided on the issue, the Supreme Court held in *Hancock v. Train* and *EPA v. California ex rel. State Water Resources Control Board, supra,* that the federal facilities were correct and that the language of these two statutes did *not* subject federal facilities to all state enforcement and procedural requirements. The Supreme Court observed that the statutes did "not provide that federal installations 'shall comply with *all* federal, state, interstate, and local requirements....'" 426 U.S. at 182 [96 S.Ct. at 2014] (emphasis original) and differentiated substantive from procedural or enforcement requirements.[5] 426 U.S. at 182–86 [96 S.Ct. at 2014–16]. Unhappy with these two decisions, Congress acted to remove such ambiguity in environmental legislation. During

**4.** Floor debate by members of later Congresses (cited by the state) reflecting their belief as to what the statute accomplished has little bearing on the intent to be attributed to the Congress which enacted the legislation. *United States v. Southwestern Cable Co.,* 392 U.S. 157, 170 [88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001] (1968).

**5.** I specifically disagree with the Ninth Circuit's attempt to create a new sovereign immunity category of "enforcement" devices separate from both "substantive" and "procedural" requirements. *California v. Walters, supra,* 751 F.2d at 978. In *Hancock v. Train,* the Supreme Court explicitly treated enforcement as included within the procedural category in the following passage concerning the Clean Air Act:

> Given agreement that § 118 makes it the duty of federal facilities to comply with state-established air quality and emission standards, the question is, as the Fifth Circuit put it in another case, "whether Congress intended that the enforcement mechanisms of federally approved state implementation plans, in this case permit systems, would be" available to

the States to enforce that duty. *Alabama v. Seeber,* 502 F.2d [1238] at 1247. [5th Cir. 1974] In the case before us the Court of Appeals concluded that federal installations were obligated to comply with state substantive requirements, as opposed to state procedural requirements, 497 F.2d, at 1177, but Kentucky rejects the distinction between procedural and substantive requirements, saying that whatever is required by a state implementation plan is a "requirement" under § 118.
426 U.S. at 183 [96 S.Ct. at 2014]. The Supreme Court went on to reject the argument that federal facilities were subject to state enforcement requirements under the Act as it then stood, and Congress subsequently revised or enacted the various statutes to include "all" state requirements "both substantive and procedural." To hold now that the procedural category does *not* include enforcement ignores the Supreme Court's analysis in *Hancock.* Whether federal facilities are subject to state *criminal* penalties, the actual issue in *Walters,* need not be decided in this case.

September, 1976, just three months after *Hancock v. Train* and *EPA v. California ex rel. State Water Resources Control Board, supra,* were announced, it passed the new Resource Conservation and Recovery Act, the subject of this lawsuit. In it, Congress used language that referred to "all" state and local requirements, made it clear that requirements were "both substantive and procedural" and specifically referred to permit requirements. The following year Congress added this new language to the Clean Air Act, the Clean Water Act, and the Safe Drinking Water Act. But along with this uniform response to the Supreme Court decision, these four environmental statutes also contained important differences in their language. The Clean Air Act provides that federal facilities:

> shall be subject to, and comply with, all Federal, State, interstate and local requirements, *administrative authority, and process and sanctions* respecting the control and abatement of air pollution in the same manner, and to the same extent as any nongovernmental entity. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and *any other requirement whatsoever* ), (B) *to the exercise of any* Federal, *State,* or local *administrative authority,* and (C) *to any process and sanction whether enforced* in Federal, State or local courts or *in any other manner.* This subsection shall apply *notwithstanding any immunity* of such agencies, officers, agents or employees under any law or rule of law. No officer, agent, or employee of the United States shall be personally liable for any *civil penalty* for which he is not otherwise liable.

42 U.S.C.A. § 7418(a) (emphasis supplied). The Safe Drinking Water Act language is comparable. 42 U.S.C.A. § 300j–6(a). This language seems consciously designed to deal with the sovereign immunity argument and to permit *all* enforcement techniques against the federal government, including state-imposed civil penalties un-

related to injunctive relief (with the sole exception of personal liability on the part of individual officers or employees), *see State of Ohio ex rel. Celebreeze v. Department of the Air Force,* No. C–2–86–0175 (S.D.Ohio Mar. 31, 1987) (unpublished opinion); *Alabama v. Veterans Administration,* 648 F.Supp. 1208 (M.D.Ala.1986). The comparable provision of the Clean Water Act is identical but for two important differences. First, the explicit provision for reasonable service charges is retained. Second, the Clean Water Act provides that "the *United States* shall be liable only for those *civil penalties* arising under Federal law or imposed by a State or local court to enforce an order or the process of such court" (emphasis supplied). 33 U.S.C.A. § 1323(a). Thus, the Clean Water Act likewise seems consciously designed to overcome the sovereign immunity argument in general but, in contrast to the Clean Air Act and Safe Drinking Water Act, to preserve explicitly the government's protection against collection of civil penalties except in the pursuit of judicial injunctive relief or in cases of federally-imposed penalties. Inexplicably, the language of the Resource Conservation and Recovery Act lacks the direct language of either the Clean Air Act and Safe Drinking Water Act on the one hand, or the Clean Water Act on the other hand, and appears to fall between them in providing only that federal entities are subject to:

> all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges. Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal Court with respect to the enforcement of any such injunctive relief.

42 U.S.C.A. § 6961. Civil penalties assessed by state administrative agencies against the government are simply not addressed in the statute as either permitted or prohibited. This omission in the Resource Conservation and Recovery Act may result from its being the first response to *Hancock v. Train* and *EPA v. California ex rel. State Water Resources Control Board, supra,* or from the manner of its enactment with no conference committee or report, but the result is an absence of guidance in either the statutory language or the legislative history.[6]

In the face of this confusion, it is appropriate to turn to the interpretation of the administrative agency in charge of overall enforcement of the Act, namely, the Environmental Protection Agency (EPA). *EPA v. California ex rel. State Water Resources Control Board, supra,* [426 U.S.] at 227 [96 S.Ct. at 2035]. EPA regulations require that states have available certain remedies for violation of state program requirements, including:

> To access [sic] or sue to recover in court civil penalties and to seek criminal remedies, including fines, as follows:
>
> (i) Civil penalties shall be recoverable for any program violation in at least the amount of $10,000 per day.

40 C.F.R. § 271.16(a)(3). This section on enforcement authority is directed generally against "any person" and the word "person" is defined in the regulations as "an individual, association, partnership, corporation, municipality, State or *Federal agency,* or an agent or employee thereof." 40 C.F.R. §§ 270.02, 271.02 (emphasis supplied). Thus the EPA has taken the position by regulation that the Resource Conservation and Recovery Act does permit and indeed require that states be able to recover fines from federal facilities violating state law. The EPA referred this very case to the State of Maine for enforcement, specifically including an assessment of civil penalties for past violations. *See* Letter of February 19, 1985, from EPA Region 1 Waste Management Division to Maine DEP Bureau of Oil and Hazardous Materials Control, Exhibit C to Plaintiff's Statement of Material Facts. At oral argument, however, in response to the court's questions on this subject, counsel for the United States revealed that the EPA's position is not endorsed by the Justice Department and that the official position of the United States as espoused by the Justice Department is that the EPA's interpretation is incorrect.

In short, the court is confronted with a picture of wholesale confusion. An ordinary reading of the statute's general terms would permit recovery of penalties but some courts interpret the Supreme Court as requiring more—a specific listing of any conceivable enforcement device a state might use. At the time of enactment, Congress was considering environmental legislation in three areas—air, water, and toxic or hazardous waste. While it expressly permitted civil penalties against the federal government in the Clean Air Act and Safe Drinking Water Act, it equally clearly prohibited them in the Clean Water Act, and the failure to recognize the issue expressly in the Resource Conservation and Recovery Act at all is therefore puzzling. Finally, although the agency assigned enforcement authority has asserted by regulation its interpretation that the statute does permit the recovery of fines, the Justice Department disagrees and takes a contrary position in litigation before the courts.

In this confusing context, I conclude that the plain language of the statute with the ordinary implications a reader would draw meets the Supreme Court's requirement that Congress plainly manifest its intent to waive sovereign immunity. As the First Circuit has said in the context of general statutory interpretation, "[s]o long as the statutory language is reasonably definite, that language must ordinarily be regarded as conclusive (at least in the absence of an unmistakeable legislative intent to the contrary)." *United States v. Charles George Trucking Co.,* 823 F.2d 685, 688 (1st Cir.

---

6. Despite the dictum in *State of Ohio ex rel. Celebreeze v. Dept. of the Air Force, supra,* I do not find in the Resource Conservation and Recovery Act "specific language to limit sanctions to those that may be imposed by a court to enforce injunctive relief."

1987). Here, Congress used comprehensive and encompassing language without limitation: "all ... State ... requirements, both substantive and procedural." Any first-year law student would think that language covered the universe; there is no reason to think that the statutory drafters had any other understanding. The government seeks a narrowing construction in the subsequent specific statutory reference to sanctions imposed by courts to enforce injunctive relief, but the language permitting such sanctions is in a parenthetical beginning with the word "including," a clear signal that nothing is being excluded by the language which follows and that it is not a complete list.[7] Modern Congresses have a heavy and complex workload. Legislative drafting is primarily the responsibility of staff members. Not only can the courts not expect every drafter to use words of such precision that they address the specific nuances of every Supreme Court decision, but we also cannot expect that Congressmen and Congresswomen will be aware of all these nuances whenever they vote on broad and all-encompassing legislation. Even if the statutory drafters or the Congressional debate at times may manage to satisfy such demands, one Congress' awareness of specific requirements cannot reasonably be attributed to the men and women of an earlier or later Congress. Instead, recognizing that the language of statutes is the language of communication, courts must be prepared to accord the words of statutes their ordinary connotations (unless the statute directs otherwise) so that Congress can effectively legislate in generalities and the courts fulfill their role of interpreting these generalities in individual fact situations.

I conclude, therefore, that the statute does permit in clear language the recovery of civil penalties by a state administrative agency against the federal government independently of court-enforced injunctive relief. Moreover, I am fortified in this conclusion by the EPA's regulation which interprets the statute in the same fashion, and by the EPA's referral of the matter to the state to collect the penalties.[8] I recommend, therefore, that the defendant's mo-

---

**7.** The subsequent statement—"Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal Court with respect to the enforcement of any such injunctive relief"—cannot support the negative inference that the United States and its employees *are* exempt from everything else, such as all other court process (for example, pursuant to a declaratory judgment action); reasonable service charges (specifically permitted under the statute); or civil penalties in general. The immunity scheme is simply too variable. Under the Clean Air Act, Safe Drinking Water Act and Clean Water Act, employees are specifically not liable for *any* enforcement-related civil penalties, regardless of their source or purpose, apparently including court-imposed sanctions to enforce injunctive relief or federally-created penalties. The government itself, however, is liable for *all* civil penalties under the Clean Air Act and Safe Drinking Water Act, but under the Clean Water Act only court-imposed penalties to enforce a court order or process and federally-created penalties. All that can confidently be inferred from this sentence in the Resource Conservation and Recovery Act is that the courts have full authority to enforce injunctive relief.

**8.** This case is quite unlike the situation confronted by Justice Brandeis in *Missouri Pacific Railroad v. Ault,* for in *Ault* the statute subjecting federally-controlled carriers to state law specifically provided that it did not apply "insofar as may be inconsistent ... with any order of the President." 256 U.S. at 558 [41 S.Ct. at 595]. The President operated the railroads through a "Director General" and the Director General in General Order No. 50 specifically permitted suits against the Director General "provided, however, that *this order shall not apply to* actions, suits or proceedings for the recovery of *fines, penalties* and forfeitures...." 256 U.S. at 562 n. 1 [41 S.Ct. at 596 n. 1] (emphasis supplied). Thus, as Justice Brandeis observed, the Director General in interpreting the law had specifically excluded the recovery of fines, penalties and forfeitures and had explicitly adopted "a much more effective and direct method" of enforcement, namely, that the Office of the Director General would enforce the laws and impose punishment for violations. 256 U.S. at 564. [41 S.Ct. at 597]. Here, in contrast, the statute does not grant the executive the authority to override state law, and the agency charged with overall enforcement has interpreted the statute to permit state recovery of civil penalties from federal facilities and has specifically referred enforcement to the state. (At oral argument, moreover, counsel for the United States took the position that the EPA itself had no authority to proceed against the federal government.)

tion for partial summary judgment so far as civil penalties are concerned be DENIED.[9]

### Fees

The second issue is whether the State of Maine can collect what it calls annual and generator fees from the shipyard.[10] Annual fees are flat fees; generator fees are fees based upon the volume and type of waste which a particular facility generates. These fees are collected in connection with administration of the state's hazardous waste program. They are not related to the civil penalties which may be imposed for violating the state statute and regulations.

The parties have focused their argument primarily upon the issue whether the fees in question are so-called user fees or a tax. They draw this distinction from *Massachusetts v. United States*, 435 U.S. 444 [98 S.Ct. 1153, 55 L.Ed.2d 403] (1978). *Massachusetts v. United States*, however, was a case raising the constitutional issue of when one sovereign can levy a tax or a user fee upon another sovereign. There was no enabling legislation for the court to interpret. Here by contrast, Congress has explicitly provided in the Resource Conservation and Recovery Act that federal facilities are responsible for "the payment of reasonable service charges." 42 U.S.C. § 6961. The first issue therefore is not a constitutional question but a question of statutory interpretation: what did Congress mean to include within that grant of power? To interpret the statutory language as merely tracking the constitutional

test would render it superfluous. I turn therefore to the question of interpretation.

The parties have been unable to point the court to any legislative history on the meaning of the term "reasonable service charges" and the United States Supreme Court has specifically recognized in another context that "the legislative history [of the same language in the Clean Water Act] casts no light on the meaning of this clause." *EPA v. California ex rel. State Water Resources Control Board, supra*, [426 U.S.] at 216 [96 S.Ct. at 2030] (rejecting the Court of Appeals' reading that the language referred to charges for state permit programs and finding reasonable the EPA's reading that it referred to recurring charges for a service like sewage treatment). Nevertheless, the term "service charge" has a reasonably well-defined content in common usage arising from the public utilities context. There is abundant caselaw to the effect that a service charge is a fee exacted for readiness to serve as opposed to the actual service itself. Thus, in the case of municipal gas companies it has been defined as the recurring charge imposed on a consumer for being hooked up to the mains—regardless of whether the consumer uses any gas in a particular period. *See, e.g., City of Rochester v. Rochester Gas & Electric Corp.*, 233 N.Y. 39, 44–45 [134 N.E. 828] (N.Y.Ct.App.1922, Cardozo, J.); *Rivelli v. Providence Gas Co.*, 44 R.I. 76, 115 A. 461, 462 (1921); *State v. Sloan*, 139 La. 881, 72 So. 428, 428–29 (1916). Analogously, the term is used in the banking context to cover a fee assessed for maintaining a deposit or

---

**9.** The government also argues that the word "requirements" is too narrow to encompass civil penalties, and cites *Romero–Barcelo v. Brown*, 643 F.2d 835, 852–56 (1st Cir.1981), *rev'd on other grounds*, 456 U.S. 305 [102 S.Ct. 1798, 72 L.Ed.2d 91] (1982). *Romero–Barcelo* held that the term "State … and local requirements" under the federal Noise Control Act, 42 U.S.C.A. § 4903, referred to regulations containing relatively precise standards capable of uniform application and that a general nuisance law did not quality. *See also Florida Dept. of Environmental Protection v. Silvex Corp.*, 606 F.Supp. 159 (M.D.Fla.1985) (state strict liability law is not within the substantive and procedural requirements to which a federal facility is subject under Resource Conservation and Recovery

Act). The issue of whether Congress intended to subject federal facilities to common-law-type standards as opposed to specific state environmental legislation, however, has nothing to do with whether the language "all … requirements, both substantive and procedural" includes enforcement mechanisms. Moreover, *Romero–Barcelo* dealt with a statute which contained merely the word "requirements," without the broad language prompted by *Hancock v. Train, supra*, the interpretation of which is the issue before the court.

**10.** The government has not challenged the collection of permit application fees.

checking account, *see United States v. First National Bank of Jackson,* 301 F.Supp. 1161 (S.D.Miss.1969), presumably independent of the number of checks written or the amount of use of the account.[11] In the absence of any evidence to the contrary, I conclude that Congress used the term "service charge" with its ordinary meaning of a charge for having a service available—in this case, a charge for a state capacity to serve the Navy, regardless of whether the Navy actually used the service.[12]

Here, the State of Maine appears to base its argument in support of its fees on the readiness and availability of its hazardous waste clean-up capacity in the event of an accident. It is not, for example, exacting a service charge in connection with its disposal of the Navy's hazardous wastes as it might be if it were operating a sewer or disposal system. But the statutory section is focused on requiring federal facilities to comply with state requirements respecting control and abatement of solid waste, suggesting that the permissible service charges are those levied in connection with state services that help control and abate solid or hazardous wastes. This is the reading which the EPA apparently gave to identical language in the Clean Water Act, *EPA v. California ex rel. State Water Resources Control Board, supra,* [426 U.S.] at 217, [96 S.Ct. at 2030] a reading which the Supreme Court found reasonable. The State of Maine, however, is not helping the generators control or abate their wastes, but providing a readiness to

---

11. In *Island Aviation, Inc. v. Guam Airport Authority,* 562 F.Supp. 951, 957 (D.Guam 1982), the court concluded that a federal statute permitting "service charges" permitted charges on a per passenger basis imposed to cover the costs of "operating and maintaining" or "providing, operating and maintaining" certain areas available for use by the participating carriers and their customers.

12. An argument might be made—although the United States has not made it in this case—that by specifically permitting only "reasonable" service charges, Congress demonstrated its understanding that the earlier language, "all ... requirements, both substantive and procedural" did not permit every financial assessment that a state might exact, and that this result is inconsistent with the conclusion reached in the previous section. In other words, if the preliminary language of the statute is truly all-encompassing in permitting a state to treat a federal facility like a private party, why add the specific language "including reasonable service charges"? Use of the term "reasonable" clearly implies that *un*reasonable service charges are not permitted regardless of the earlier language.

But just as the parties in their briefing and argument have treated the civil penalty and reasonable service charge issues as unrelated, both legislative history and analysis of the statute likewise suggest that no inferences on civil penalties should be drawn from the "reasonable service charge" language. The "reasonable service charge" language first appeared in 1972 in the Clean Water Act, well before the judicial debate over state enforcement and procedural requirements (culminating in *Hancock v. Train* and *EPA v. California ex rel. State Water Resources Control Board, supra*) and the ensuing legislative debate. The Supreme Court concluded in 1976 that the language had basically no bearing on the issue of whether federal facilities were subject to state enforcement and procedural requirements under the Clean Water Act. Instead, the Court found reasonable the EPA's interpretation that the language dealt with fees for a service. 426 U.S. 200, 217 [96 S.Ct. 2022, 2030]. Careful consideration of the differences between civil penalties and service charges bears out their mutual independence. Payment of a charge for a service is conceptually distinct from payment of a penalty imposed for refusing to comply with a state requirement. In subjecting federal facilities to "all ... State ... requirements, both substantive and procedural ... respecting control and abatement of solid waste or hazardous waste disposal ...," Congress focused on state prescriptions and proscriptions on how a facility disposes of its waste, the "thou shalts" and the "thou shalt nots" of state programs. Civil penalties are a normal and expected means by which a state enforces its requirements. The "payment of reasonable service charges," on the other hand, contemplates fees for a state-provided service, a subject different from law enforcement. Here, unlike its demand for wholesale compliance with all state requirements, Congress has provided that federal facilities will pay only "reasonable" charges. There is no inconsistency between the two conclusions. Finally, a reluctance to infer that civil penalties are precluded by the "reasonable service charge" language is reinforced by the fact that Congress retained this very language in the Clean Water Act, yet considered it advisable to include at the same time explicit language that the United States would not be liable for civil penalties other than those arising under federal law or imposed by a court to enforce a court order. This additional language preserving immunity against civil penalties is not contained in the Resource Conservation and Recovery Act.

respond to an accident—a service more analogous to that of a municipal fire department or rescue unit. Nothing in the statute indicates that Congress envisaged a special meaning for the term "service charges" that would extend it to cover the cost of the state's creation of a capacity to deal with spills or accidents that might otherwise threaten the environment and the public, laudable as that goal is. I conclude therefore that the enabling legislation to impose service charges does not extend to the charges in question and turn to the constitutional issue of whether Maine may levy the charges without Congressional authorization.

The parties agree that *Massachusetts v. United States* furnishes the appropriate constitutional analysis.[13] In *Massachusetts v. United States*, the Supreme Court reasoned that while one sovereign could generally not impose taxes on another sovereign, "taxes that operate as *user fees* may constitutionally be applied." 435 U.S. at 463 [98 S.Ct. at 1165] (emphasis supplied). In deciding whether a particular levy is an impermissible tax or a permissible user fee, the Court reiterated a three-part test that it had enunciated in *Evansville–Vanderburg Airport Authority v. Delta Airlines, Inc.,* 405 U.S. 707 [92 S.Ct. 1349, 31 L.Ed.2d 620] (1972), that levies are valid as user fees "so long as they (1) do not discriminate against interstate commerce, (2) are based upon some fair approximation of use, and (3) are not shown to be excessive in relation to the cost to the government of the benefits conferred."[14] 435 U.S. at 464. The parties

agree that the first factor is inapplicable here. Thus, their dispute concerns whether factors (2) and (3) are satisfied.

There appears to be confusion over the content of the second standard, that fees be "based upon some fair approximation of use," probably deriving from *United States v. Maine,* 524 F.Supp. 1056 (D.Me. 1981), where the court ruled that federal credit unions within the State of Maine were not liable for the payment of sliding scale fees under the Maine Consumer Credit Code. The court there interpreted the second factor of *Massachusetts v. United States* as raising the issue: "[i]s the charge 'a fair approximation of the cost of the benefits' received?" 524 F.Supp. at 1059. This formulation, however, collapses the second factor into the third factor, which is whether the fees are "excessive in relation to the cost ... of the benefits conferred." A close reading of the Supreme Court's decision in *Massachusetts v. United States* makes clear that the second factor is designed to ascertain whether the *allocation* of the fees among users is based "upon some fair approximation of use" whereas the third factor measures the cost to the government against the benefits conferred. 435 U.S. at 466–67 [98 S.Ct. at 1166–67]. In other words, to sustain a particular fee as the equivalent of a user charge it must be shown first that it is allocated among users on a basis that approximates the proportions of their respective use. This is a separate issue from whether the overall cost to the government is reflected in the total levy.[15] In this case, focusing as they

**13.** I note in passing that *Massachusetts v. United States* involved the propriety of a federal assessment upon a state, whereas this case challenges the propriety of a state imposition upon the federal government. As the Court noted in *Massachusetts v. United States,* "[t]he immunity of the Federal Government from state taxation is bottomed on the Supremacy Clause, but the States' immunity from federal taxes was judicially implied from the States' role in the constitutional scheme." 435 U.S. at 455 [98 S.Ct. at 1160]. The parties have declined to pursue any difference in analysis which might flow from this distinction.

**14.** In contrast, a tax raises revenue to support general public purposes, rather than to benefit the persons paying the fee. *See United States v.*

*Maryland,* 471 F.Supp. 1030, 1036 (D.Md.1979); *Nat'l Cable Television Ass'n. v. United States,* 415 U.S. 336, 340–41 [94 S.Ct. 1146, 1148–49, 39 L.Ed.2d 370] (1974).

**15.** The issue arose in *Massachusetts v. United States* because the fees levied there (like the annual fees here) included annual *flat* fees and Massachusetts had argued that as such they could not meet the test of being related to use. The "only legitimate fear" the Supreme Court could identify in this argument was "that the flat-fee requirement may result in the collection from [Massachusetts] of more than its actual 'fair share.'" 435 U.S. at 465 [98 S.Ct. at 1166]. The Court pointed out that the actual operation of the flat fee charge in that case would probably result in "exacting less money from the State

have on whether the fees actually charged to the federal facility approximate the cost of the benefits that it received, the parties have failed to argue this issue, although when pressed on the subject at oral argument, counsel for the United States conceded that he had no challenge to the fairness of the allocation as such. Clearly, summary judgment for the United States on this record is inappropriate so far as this factor is concerned.

The third factor is whether the fees are "shown to be excessive in relation to the cost to the government of the benefits conferred."[16] Put more directly, the question is whether the state's total receipts significantly exceed its total costs in providing the benefit. In resolving this issue, *Massachusetts v. United States* has recognized that a match cannot be perfect and that trust funds are appropriate to collect revenue for use against the possibility of later excess demands being imposed upon the system. 435 U.S. at 448–49 [98 S.Ct. at 1157–58].[17] The State of Maine has stated by affidavit that the total cost of its Resource Conservation and Recovery Act program for the years 1980 to 1985 exceeded the fees it collected in each year and the United States, the moving party, did not contest this at oral argument. The parties differ, however, over whether an important part of the costs, the establishment and maintenance of a hazardous waste clean-up capability, benefits the generators and can therefore be covered by a user fee, or the public at large and should therefore be treated as a tax. I have concluded that this readiness to serve in a clean-up capacity is not encompassed within the statutory term "reasonable service charges"; it is not a long step to the conclusion that, as a

matter of constitutional analysis, such a capacity confers a public benefit rather than a benefit to the generators in particular, and may not be covered by a user fee, *see* note 14, *supra*. Resolution of the constitutional issue, however, would benefit from an amplified record and briefing on this issue. The United States also argues that federal grant money should be considered in assessing the relationship between fees and expenditures, whereas Maine argues that it may set its fees to cover the federal share of the program cost. This issue requires greater elaboration of the relationships between the federal and state funds. Finally, if the court were to determine that the amount of the fees is excessive in relation to the cost of the benefits actually conferred upon hazardous waste generators, it may be that such fees should not be struck down in their entirety, but only reduced by the amount which is excessive. Therefore, the court would need to entertain evidence concerning what part of the fee is reasonable. These factors counsel the denial of the motion for summary judgment, and I so recommend.

Accordingly, I recommend that except for the state's claim under the Oil Discharge Prevention and Pollution Control Act, the defendant's motion for summary judgment be DENIED and that, as to that claim, it be GRANTED.

## NOTICE

A party may file objections to those specified portions of a magistrate's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by

16. Although the state contended at oral argument that there was no factual issue here, the state has not cross-moved for summary judgment. In any event, I am satisfied for the reasons stated in text that this issue requires further factual development.

than it would have to pay under a perfect user-fee system" because large numbers of private parties also paid the flat fees. 435 U.S. at 466 [98 S.Ct. at 1166]. Moreover, the attempt to make the allocation more precisely related to the actual fair share would result in increased administrative costs and thereby an overall increase in the amount of revenue needed to operate the system. As a result, the Court found that the allocation system was sufficiently related to proportional use to pass constitutional muster.

17. The Maine statute caps the buildup of the Hazardous Waste Fund at $600,000 and directs that when that level is reached all fees will be proportionally reduced "to cover only removal costs incurred and sums approved by the Legislature." 38 M.R.S.A. §§ 1319–D, 1319–I(7).

the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

DATED at Portland, Maine, this 16th day of November, 1987.

(s) D. BROCK HORNBY
United States Magistrate